**In re PORT ROYAL LAND & TIMBER CO., Debtor.**

**Bankruptcy No. 86–00783.**

United States Bankruptcy Court, S.D. Alabama.

Aug. 25, 1989.

David S. Maxey, Birmingham, Ala., for debtor.

James W. Tarlton, IV, W. Alexander Gray, Jr., Mobile, Ala., for Matthew P. Dial, Jr.

J. Don Foster, Foley, Ala., and Robert E. Gibney, Mobile, Ala., for various Bryars interests.

Steve Olen, Mobile, Ala., for estate of Rex Roberts.

Marc E. Bradley, Mobile, Ala., for R.H. McLeod.

ARTHUR B. BRISKMAN, Bankruptcy Judge.

## ORDER

This matter came on for hearing on the "Application of Berkowitz, Lefkovits, Isom & Kushner, Attorneys for Debtor and Debtor In Possession, for Final Allowance of Compensation for Services Rendered Through February 3, 1989, and for Reimbursement of Disbursements."

Having duly considered this application for compensation and the applicable legal principles involved herein, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Port Royal Land & Timber Company (hereafter Port Royal) is a partnership originally consisting of Emmett F. Hildreth, Jr., Allison D. Hildreth, Matthew P. Dial, R.H. McLeod, and Rex W. Roberts. The partnership was formed for the purpose of purchasing and managing real estate.

2. In October, 1979, Port Royal purchased a large tract of land in Hale County, Alabama. The seller, C.H. Bryars, was given a promissory note covering a large portion of the purchase price and a mortgage to secure the promissory note. In 1981, Port Royal obtained a loan from Demopolis Production Credit Association (hereafter PCA) giving the lender a promissory note and a second mortgage on the timber and real estate to secure the note. By virtue of a timber release given by Bryars in 1984, PCA's mortgage became a first mortgage as to the timber.

3. In October, 1985, Port Royal defaulted on the Bryars note and the note was accelerated. In January, 1986, Port Royal defaulted on the loan payment to PCA. Both mortgages were advertised for foreclosure on June 6, 1986. Bryars conducted a foreclosure sale as advertised, while PCA continued its foreclosure sale to June 13, 1986. E.A. Drummond purchased the real property at the foreclosure sale.

4. On June 9, 1986, Matthew Dial and R.H. McLeod, former partners of Port Royal who had withdrawn from the partnership and received promissory notes from Port Royal for their investment interests, filed an involuntary bankruptcy petition against Port Royal in order to protect their unsecured interests. On August 12, 1986, Port Royal filed their answer and consented to the petition under Chapter 11, and relief was granted.

5. In June, 1986, Port Royal employed the law firm of Berkowitz, Lefkowitz, Isom and Kushner (hereafter Berkowitz) to represent it in the involuntary bankruptcy which had been filed against it and all related legal proceedings. Among other aspects of its representation of Port Royal, Berkowitz defended the involuntary bankruptcy proceeding, commenced the voluntary Chapter 11 proceeding, negotiated the sale of the estate's sole asset, obtained approval of the disclosure statement, and confirmation of a liquidating plan of reorganization.[1]

6. Perhaps the largest part of the Berkowitz representation of the Debtor was the initiation and litigation of an adversary proceeding seeking to set aside the Bryars foreclosure sale and assertion of the Debtor's right of redemption. The Complaint was filed in December of 1986.

7. On May 9, 1988, Berkowitz was successful in resolving the redemption issue of the adversary proceeding by virtue of a settlement agreement with E.A. Drummond. The agreement provided that Drummond would pay $300,000.00 to the bankruptcy estate in exchange for any right of redemption and timber rights Port Royal may have held in the foreclosed property. The $300,000.00 became the only asset of the estate. This part of the complaint having been resolved, the issue of fraudulent conveyance vis-a-vis the prepetition foreclosure was tried before the Bankruptcy Court in July of 1988. The Debtor was unsuccessful in this attempt to set aside the transfer; the Court found that at least seventy (70%) percent of the value of the property was realized through the foreclosure sale and, therefore, under the *Durrett* standard there was no fraudulent conveyance. *Durrett v. Washington National Insurance Co.,* 621 F.2d 201 (5th Cir.1980).

8. No retainer was given to Berkowitz by the Debtor upon the firm's employment. Since the Court must approve bankruptcy compensation, the employment amounts to a contingency arrangement. In its initial

1. The term "liquidating plan of reorganization" is oxymoronic. Liquidations and reorganizations are divergent concepts. The Bankruptcy Code defines neither reorganization nor liquidation. Even though Chapter 11 of Title 11 of the United States Code is entitled "Reorganizations", there are only three references (§ 1113(b)(1)(A), § 1129(a)(11) and § 1166(2)) to "reorganization" in the Chapter 11 statute. A reorganization connotes a financial reconstruction or rehabilitation. For instance, Section 1112(b)(1) permits the court, on request of a party in interest and after notice and hearing, to dismiss or convert a case under Chapter 11 if there is an absence of a "reasonable likelihood of *rehabilitation.*" 11 U.S.C. § 1112(b)(1) (emphasis added). Thus, it appears the purpose of a reorganization is to rehabilitate the debtor so as to enable it to carry on its business in a different or restructured form.

Antipodally, a liquidation connotes an appropriation of assets towards the discharge of indebtedness. Typically, large scale liquidations are associated with the dissolution of a going concern. Yet, pursuant to 11 U.S.C. § 1129(a)(11), the court may approve a Chapter 11 Plan proposing a liquidation. Such plans may be cost efficient (as opposed to the appointment of a trustee to perform the liquidation) but are not reorganizations as common usage suggests. Despite our recognition of the incongruent nature of a "liquidating plan of reorganization," we will nonetheless employ this commonly used term, as it was employed by the Eleventh Circuit Court of Appeals in *In re Daiken Miami Overseas, Inc.,* 868 F.2d 1201 (11th Cir.1989).

final application for funds, Berkowitz requested a total of $79,487.00 as compensation for services performed in representing Port Royal from June 9, 1986, until February 3, 1989. Additionally, the firm requested a $20,000.00 enhancement and $849.15 for the reimbursement of expenses.

9. Berkowitz amended the final fee application for an additional request of $3,671.50 for services rendered from February 2, 1989, until May 20, 1989. Berkowitz also seeks an additional $504.76 for the reimbursement of expenses. This brings the total requested compensation to $83,-158.50 and the total requested reimbursement of expenses to $1,353.91.

10. By Orders dated May 10, 1988, and February 2, 1989, the Court approved interim payments of compensation to Berkowitz in the amounts of $30,000.00 and $20,-000.00, respectively. Since the instant final fee application as amended, includes the hours for which interim compensation was allowed, any award granted herein shall be reduced by the $50,000.00 previously awarded.

11. During the representation of Port Royal, Berkowitz expended 946 hours in service to the Debtor. Five lawyers and five paralegals contributed these hours. Senior partner John P. Whittington billed his time at $130.00 per hour, David S. Maxey, who performed the largest portion of the services, billed time at $85.00 per hour, other lawyers and paralegals were billed at rates ranging from $75.00 per hour to $45.00 per hour. The Court finds that $85.00 per hour is a reasonable rate to be applied to hours found to have been reasonably expended. The Court further finds that the 946 hours billed by Berkowitz were reasonably expended in the representation of the Debtor. The Court also finds that the total requested expenses of $1,353.91 were reasonably expended in the representation of the Debtor.

12. Berkowitz is a firm consisting of experienced, highly-skilled bankruptcy lawyers and paralegals who enjoy an outstanding statewide reputation. The firm represented the Debtor with diligence and efficiency. The firm's representation of the Debtor was highly professional, served the best interest of the Debtor and, based on the facts and circumstances, provided excellent results for the Debtor and its estate.

13. Based upon Berkowitz's detailed time records, the Court finds that a minimum of 373.2 hours would not have been expended but for the complaint to set aside the foreclosure. The 373.2 hours were reasonably expended in the litigation of the preference action. Under the facts and circumstances, the Debtor had a fudiciary obligation to prosecute the preference action and had a reasonable expectation of success. If the Debtor prevailed, it would have significantly benefitted the creditor of its estate.

14. C.H. Bryars, the Defendant in the complaint to set aside the foreclosure and an unsecured creditor in this proceeding, objects to the allowance of any attorney's fee for hours spent by Berkowitz related to the unsuccessful adversary proceeding.

## CONCLUSIONS OF LAW

The Court must address the difficult and recurring issue of attorney compensation in bankruptcy proceedings. The Court is guided in this task by several sections of the Bankruptcy Code, as well as a recent Eleventh Circuit decision, which although the Court finds applicable to bankruptcy proceedings, is nevertheless difficult to apply.

■ Under Section 327(a) of the Bankruptcy Code, a trustee (and a debtor-in-possession by virtue of 11 U.S.C. § 1107) may employ an attorney with the approval of the court. While the employment of the attorney may be based "on any reasonable terms and conditions," the Bankruptcy Court may disregard such agreement where necessary and award compensation more appropriate under the individual circumstances of the case. 11 U.S.C. § 328.[2]

2. Section 328(a) reads as follows:

(a) The trustee, or a committee appointed under section 1102 of this title, with the court's

Section 330 of the Bankruptcy Code sets forth the standard upon which a court will base compensation for an attorney. The basic thrust of Section 330 is that the Court will award "reasonable" compensation for "actual and necessary" services rendered by the attorney, as well as reimbursement for "actual and necessary" expenses.[3]

In addition to the Bankruptcy Code sections which govern attorney compensation, Bankruptcy Rule 2016 sets forth the procedure to be followed by a party seeking compensation. The Rule requires a detailed statement be filed setting forth the amounts requested, services rendered, time expended, expenses incurred, as well as other information the Court may find useful in determining the fee award. Bank.R. 2016(a).

In 1974, the former Fifth Circuit Court of Appeals issued its opinion in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). This decision became the leading case in the area of attorney fees. Upon its review of an attorney's fee award in a Title 7 class action, the circuit court delineated twelve factors to be used by the trial court in determining a reasonable attorney's fee.[4]

In spite of the fact that *Johnson* arose from an employment discrimination lawsuit filed pursuant to 42 U.S.C. § 2000e *et seq.*, the Fifth Circuit subsequently held that "the guidelines we established [in *Johnson*] are equally useful whenever the award of reasonable attorneys' fee is authorized by statute." *Matter of First Colonial Corp. of America*, 544 F.2d 1291, 1299 (5th Cir.1977). In applying the *Johnson* factors to determine a reasonable fee within the meaning of Section 64(a)(1) of the Bankruptcy Act, *First Colonial* noted that there are also a number of peculiarities in bankruptcy proceedings which must be taken into account when awarding attorney's fees. The Court observed that there is a strong policy in the Bankruptcy Act that estates be administered as efficiently as possible and, therefore, the bankruptcy judge should award an attorney's fee at the lower end of the spectrum of reasonableness. *First Colonial*, at 1299. The Court then established a three-step procedure for determining the reasonableness of a bankruptcy attorney's fee: 1) the court must ascertain the nature and extent of the services performed; 2) the court must assess the value of the services performed; and 3) the court must explain the findings upon which the award is based. *Id.* at 1299–1300.

In *Matter of U.S. Golf Corp.*, 639 F.2d 1197 (5th Cir.1981), the Fifth Circuit followed its holding in *First Colonial* and once again applied the *Johnson* factors in

approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. *Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment,* if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a) (emphasis added).

**3.** Section 330 provides that the court may award to an attorney the following:

(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, profession-al person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and (2) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1, 2).

**4.** The twelve factors set forth by the *Johnson* Court are: 1) the time and labor required; 2) the novelty and difficulty of the legal questions involved; 3) the skill required to perform the legal services properly; 4) the preclusion of other employment by the attorney due to the case; 5) the customary fee; 6) whether the fee is fixed or contingent; 7) time limitations imposed by the client or other circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation and ability of the attorneys; 10) the "undesirability" of the case; 11) the nature and length of the professional relationship with the client; and 12) awards in similar cases. *Id.* at 717–719.

the context of a bankruptcy proceeding. In doing so, the *Golf* Court established definitively that the burden of establishing the value of attorney's services is upon the party claiming the fee in the bankruptcy case. *Matter of U.S. Golf Corp.*, 639 F.2d at 1207.

In a statement of dictum not necessary to the Court's holding, the *Golf* Court noted that although *First Colonial* dealt with a fee award under the Bankruptcy Act, the same considerations would nevertheless apply under the newly enacted Bankruptcy Code. *Id.* 639 F.2d at 1201. While in its broad application this is true, there are definite differences in the approach to attorney's fees taken by the Bankruptcy Act and the Bankruptcy Code. Indeed, while *First Colonial* encouraged the efficient and economical administration of the bankruptcy estate and the compensation of attorneys at the "lower end of the spectrum" of reasonableness, the legislative history of the Section 330 of the Code reflects a contrary intent of Congress:

> Attorneys' fees in bankruptcy cases can be quite large and should be closely examined by the Court. However, bankruptcy legal services are entitled to command the same competency of counsel as other cases. *In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under Title 11 at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under Title 11 ... Notions of economy of the estate in fixing fees are outdated and have no place in the Bankruptcy Code.*

124 Cong.Rec. H. 11,091–2 (Sept. 28, 1978); S.17,408 (Oct. 6, 1978) (emphasis added). See also 2 *Collier on Bankruptcy* 330.03 (15th Ed.1988). Thus, it would appear that although the *Johnson* factors were not legislatively overruled by the enactment of the Code, but in fact were partially included in the guidelines of Section 330, the *First Colonial* overall spirit of economy has been extinguished.

For years *Johnson v. Highway Express*, 488 F.2d 714 (5th Cir.1974) has been a leading case in the area of attorney's fees and has been followed by many bankruptcy courts as the seminal case in determining the reasonableness of compensation in bankruptcy proceedings. In 1988, however, the Eleventh Circuit Court of Appeals decided *Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292 (11th Cir.1988). Like *Johnson*, *Norman* did not arise out of a bankruptcy case, but rather a civil rights class action. Indeed, *Norman* does not expressly mention bankruptcy compensation, and for this reason, may be distinguished by some courts as not applying to bankruptcy cases. However, just as the general statutory attorney's fee case of *Johnson* was applied specifically to bankruptcy cases in *First Colonial* the more recent *Norman* case supercedes *Johnson*, is likewise applicable to bankruptcy cases, and is thus the mandate of the Eleventh Circuit Court of Appeals by which this Court is bound. While there are problems in the application of *Norman* to bankruptcy fee petitions, *Norman* nevertheless replaces *Johnson* as the leading case guiding this Court in its determination of the reasonableness of attorney's fees in bankruptcy cases.

In its initial paragraphs, *Norman* cites five United States Supreme Court cases dealing with attorney's fees decided during this decade,[5] and explains that it is the Eleventh Circuit's intention to "further refine our views of the analysis required under these recent Supreme Court decisions." *Norman*, 836 F.2d at 1299. The Court goes on to adopt and describe the "lodestar" approach for determining the reasonableness of attorney's fees. The first step in this method is to determine a

---

**5.** *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Riverside v. Rivera,* 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986); *Pennsylvania v. Delaware Valley Citizens' Council,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (*Delaware Valley Citizens' Council I*); and *Pennsylvania v. Delaware Valley Citizens' Council,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (*Delaware Valley Citizens' Council II*).

reasonable hourly rate for the attorney involved; applying the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation. *Id.* The burden is on the fee applicant to prove the requested rate is in line with the prevailing market rate. Although *Norman* replaces *Johnson* as the seminal attorney's fee case, *Norman* itself states that some of the twelve Johnson factors may be examined to determine a reasonable hourly rate in a given case. *Id.*

Once the court determines a reasonable hourly rate for a given attorney, the next step in the lodestar methodology is the computation of hours reasonably spent. Excessive, redundant or otherwise unnecessary hours should be excluded. *Id.* at 1301. The court should also deduct hours spent on unsuccessful claims. *Id.* at 1302.

The multiplication of a reasonable hourly rate times the number of hours reasonably expended yield the lodestar amount. *Norman* then requires that the court consider whether an adjustment should be made to the lodestar amount based upon the results obtained. Where the results are excellent, the entire lodestar amount should be awarded. Where the attorney's services resulted in partial or limited success, the court is required to reduce the lodestar amount to an amount that is not excessive. In reducing the lodestar amount, the court may identify specific hours spent on unsuccessful claims, or simply reduce the award by a proportionate amount. Conversely, if results obtained by the attorneys were exceptional, then the lodestar amount may be increased. *Norman*, 836 F.2d at 1302. Finally, the lodestar may be increased where there will be a considerable delay in counsel receiving payment of attorney's fees; the enhancement should take into account the time value of money and the effects of inflation. *Id.*

Due to considerations peculiar to bankruptcy proceedings, the application of the *Norman* lodestar methodology to bankruptcy cases is not without its problems. When the Fifth Circuit applied the *Johnson* factors to bankruptcy proceedings in *First Colonial,* the court therein noted that the peculiarities of bankruptcy practice had to be considered. 544 F.2d at 1299.

In applying the *Norman* lodestar approach to bankruptcy proceedings, this Court notes the generation of a different issue because of the status of trustee, debtor-in-possession and authorized creditors committee attorneys as officers of the court. Attorneys in this situation are required to perform services and pursue litigation in their fiduciary capacity as representatives of the estate which they might not pursue under other circumstances. Lest they be criticized for being negligent in the protection of the estate and unsecured creditors, these attorneys may often expend hours of billable time on matters which may generate no income for the estate, but which nevertheless must be performed. If these highly specialized and experienced attorneys are not adequately compensated for the hours reasonably expended on required representation of the estate, the bankruptcy bar may be chilled into avoiding representation of such clients. The lack of adequate representation may be counter productive to maximizing the potential benefit to the estate and ultimately to its creditors. In the long run, encouragement of representation of the highest calibre in our courts, not only enhances the system, but benefits the debtors and creditors who are the ultimate benefactors of the Bankruptcy Code.[6]

The *Norman* doctrine emphasis on reasonably expended hours and reduction for unsuccessful services, while effective in the civil rights format, may not provide adequate compensation to encourage quality representation of trustees, debtors-in-possession and authorized committees. It is the duty of these attorneys to expend hours for which there may be no accurate measure of success or failure. For instance, success in the context of a Chapter

---

6. It is just this circumstance that Congress sought to change in enacting Section 330. See

Legislative history cited *supra.*

11 proceeding may not be the confirmation of a plan, but rather may be the efficient liquidation of the Chapter 11 Debtor. A Chapter 7 trustee may be unsuccessful in seeking to avoid a preference, but nevertheless was obliged to pursue any colorable claim on behalf of unsecured creditors, and therefore, "successful" in performing his or her role as trustee.

Nevertheless, in spite of the difficulties associated with the lodestar, *Norman* applies to bankruptcy proceedings and will guide this Court in the determination of the reasonableness of the instant fee application. Having made a finding that the reasonable rate for Berkowitz's services at $85.00 per hour, and having found that all 946 hours for which compensation is requested were reasonably spent, the Court multiplies the two figures to determine the lodestar amount of $80,410.00.

Once the lodestar amount is established, *Norman* requires the court to adjust the award based upon the results obtained. "If the result was partial or limited success, then the lodestar *must* be reduced to an amount that is not excessive ... In doing so the court may attempt to identify specific hours spent in unsuccessful claims or it may simply reduce the award by some proportion." *Norman v. Housing Authority of City of Montgomery,* 836 F.2d 1292, 1302 (11th Cir.1988) (emphasis added).

■ The Court has above identified 373.2 hours expended by Berkowitz on the unsuccessful fraudulent transfer litigation. Under the *Norman* mandate, the lodestar must be reduced because of this unsuccessful litigation. The Court concludes the 373.2 hours attributable solely to the portion of the complaint which seeks to set aside the foreclosure shall be excluded as an adjustment based on lack of results. Thus 373.2 hours are due to be subtracted from the total 946 hours spent by Berkowitz, leaving the total hours at 572.8. At $85.00 per hour, the fee award is reduced to $48,688.00.

It should be noted that none of the hours excluded were spent on matters related to the redemption portion of the complaint, the settlement of which garnered the es-

tate $300,000.00. In addition to the success of this action, Berkowitz was also successful in the approval of a disclosure statement and confirmation of the Debtor's liquidating plan of reorganization. Based on these successes, the Court concludes that an enhancement is due Berkowitz under the *Norman* principle that enhancement may be appropriate for exceptional results.

■ *Norman* also authorizes an enhancement for the time value of the fee award where there is a delay in its receipt. Similarly, there may be an enhancement where contingency representation is involved. Based on the results which were exceptional, the time value of the delay in receiving the fee, and the contingency nature of the representation, the Court concludes that an enhancement of $10,000.00 is due to be awarded.

In conclusion, the Court determines that the 946 hours reasonably expended by Berkowitz in representation of the Debtor shall be reduced by 373.2 hours for time expended on unsuccessful litigation, leaving 572.8 hours compensable at the reasonable hourly rate of $85.00 per hour. Based on these figures, the amount of compensation totals $48,688.00. The Court then awards an enhancement of $10,000.00. The $50,000.00 interim compensation previously paid is due to be credited against this amount. The requested reimbursement of expenses in the amount of $1,353.91 is due to be allowed.

### ORDER

Based on the foregoing, it is hereby ORDERED, ADJUDGED and DECREED that the "Application of Berkowitz, Lefkovitz, Isom & Kushner, Attorneys for Debtor and Debtor In Possession, for Final Allowance of Compensation for Services Rendered Through February 3, 1989, and for Reimbursement of Disbursements" as amended is APPROVED to the extent that Berkowitz is ALLOWED $58,688.00 in compensation for services rendered to the estate and $1,353.91 for the reimbursement of expenses, for a total of $60,041.91; and it is further

ORDERED, ADJUDGED and DE-CREED that Berkowitz is allowed an administrative claim after credit of the interim compensation in the amount of $10,041.91; and it is further

ORDERED, ADJUDGED and DE-CREED that the objection of C.H. Bryars to the full allowance of the compensation is SUSTAINED to the extent set forth above.