**7.** This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to

debts are not dischargeable under § 523(a)(4).

JUDGMENT ACCORDINGLY [7].

### In re William F. and Betty C. FARAH, Debtors.

### Bankruptcy No. 90-30845-C.

United States Bankruptcy Court, W.D. Texas, El Paso Division.

June 19, 1992.

Bankruptcy Rule 7052.

Farah, Inc., a publicly-traded and nationally known pants manufacturer. Faced with an increasingly difficult business atmosphere coupled with bitter divisions within both the family and the management of the corporation, Farah stepped down as CEO in exchange for $1.2 million in cash and a three-year consulting contract worth approximately $1 million. A year later, the Farahs filed bankruptcy. A balance sheet prepared to reflect the Farahs' financial condition at the time of filing showed that the Farahs had liabilities which exceeded their assets by approximately $5,674,-404.70.

Unlike most Chapter 11 cases, the Farahs did not have an ongoing business to reorganize; instead, the case was handled as a Chapter 11 liquidation. An analysis of the status of parties-in-interest as of the date of filing shows that several secured creditors were expecting to lose well over $125,000 each, and the projected recovery for general unsecured creditors, who held claims in excess of $250,000, was five percent (5%) or less. The Farahs, who owned stock in Farah, Inc. with an estimated value of $4 million, hoped at that time to retain exempt assets of approximately $110,000. At the time of filing, counsel stood a very good chance of not being paid at all.

By confirmation, the situation had very much improved. Due primarily to the efforts of Mr. Krafsur, every creditor of the estate, secured and unsecured, was paid in full. Several have even been paid interest and attorneys' fees. The Farahs themselves have emerged from Chapter 11 with a net worth approaching $3.5 million.

Debtors' counsel filed a fee application requesting $119,320.50 in actual fees and $8,203.40 in actual expenses. At the hearing on the fee application, Debtors' counsel also requested a fee enhancement, based upon the rare and exceptional results which he maintained he and his firm had obtained in the case. Debtors' counsel represented to the court that the debtors (who would be the only persons affected in this case by such an award) supported an enhancement. The application for fees and expenses was

## DECISION AND ORDER ON APPLICATION FOR PAYMENT OF ATTORNEY'S FEES AND REQUEST FOR FEE ENHANCEMENT

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for consideration the request of Mayfield & Perrenot, P.C. for a Fee Enhancement. Upon consideration thereof, the court finds and concludes that the representation afforded the debtors by Mr. Andrew B. Krafsur in this case justifies the award of a fee enhancement.

### FACTUAL HISTORY

On August 7, 1990, William and Betty Farah filed for relief under Chapter 11 of the Bankruptcy Code. Until 1989, Mr. Farah had been the chief executive officer of

granted, but the court took the fee enhancement request under advisement, given the rarity with which this court ever allows fee enhancement to any professional in any case, and directed Debtors' counsel to submit further briefs to the court. Upon consideration thereof, the court now makes the following findings of fact and conclusions of law.

### ANALYSIS

#### I. IN GENERAL

■■■ The determination of a reasonable fee in a bankruptcy case begins with an examination of 11 U.S.C. § 330(a), which provides in pertinent part:

(a) After notice to any parties in interest and to the United States Trustee and a hearing ... the court may award to ... the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such ... attorney ... as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the costs of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a). The touchstone in this analysis is the phrase "reasonable compensation". *In re Morris Plan Co. of Iowa,* 100 B.R. 451, 455 (Bankr.N.D.Iowa 1989). Determining what constitutes reasonable compensation is soundly within the discretion of the bankruptcy court, primarily because the bankruptcy judge is in the best position to determine the reasonableness of a proposed fee. *See In re Anderson,* 936 F.2d 199, 204 (5th Cir.1991); *see also In re Lawler,* 807 F.2d 1207, 1211 (5th Cir.1987); *In re Consolidated Bancshares Inc.,* 785 F.2d 1249, 1254 (5th Cir.1986); *Evans v. City of Evanston,* 941 F.2d 473, 477 (7th Cir.1991) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 436–7, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983)). In addition to a finding

of reasonableness, the bankruptcy court must make a finding that the services rendered were necessary. *See In re First Colonial Corp. of America,* 544 F.2d 1291, 1298 (5th Cir.), *cert. denied,* 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977); *In re Temple Retirement Community,* 97 B.R. 333, 336 (Bankr.W.D.Tex.1989). The burden of proof is on the party requesting the compensation. *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *see also Continental Ill. Nat'l Bank & Trust v. Charles N. Wooten, Ltd. (In re Evangeline Ref. Co.),* 890 F.2d 1312, 1326 (5th Cir.1989) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 433–34, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983)); *Graves v. Barnes,* 700 F.2d 220, 223 (5th Cir.1983); *Tomazzoli v. Sheedy,* 804 F.2d 93, 96 (7th Cir.1986).

■■■ In evaluating whether the fee applicant has carried the burden of proof, the court must engage in the two-step analysis imposed by § 330(a)(1). *In re Office Products of America, Inc.,* 136 B.R. 964, 976 (Bankr.W.D.Tex.1992) (citing *In re Temple Retirement Community, Inc.,* 97 B.R. 333, 338 (Bankr.W.D.Tex.1989)); *see also First Colonial,* 544 F.2d at 1298. The bankruptcy court must first ascertain the nature and extent of the necessary and appropriate services rendered by the professional. The court must then assess the reasonable value of those services. *Office Products,* 136 B.R. at 976; *First Colonial* at 1299. The resulting product is often referred to as the "lodestar", which is presumed to be a reasonable fee. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 564, 106 S.Ct. 3088, 3097–98, 92 L.Ed.2d 439 (1986); *Blum v. Stenson,* 465 U.S. 886, 894, 104 S.Ct. 1541, 1546–47, 79 L.Ed.2d 891 (1984); *Graves v. Barnes,* 700 F.2d 220, 222 (5th Cir.1983) (adopting "lodestar" method of calculation, citing *Copper Liquor Co. v. Adolph Coors Co.,* 684 F.2d 1087, 1092–93 (5th Cir.1982)).[1] Once the lodestar has

---

**1.** The "lodestar" method has been adopted in several other circuits, though not specifically in the Fifth Circuit (at least not for bankruptcy cases). *See City of Detroit v. Grinnell Corp.,* 560

F.2d 1093 (2d Cir.1977); *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102 (3d Cir.1976) (en banc); *Copeland*

been determined, the bankruptcy judge must explain the findings upon which the award is based, including in the explanation a discussion of how each of the twelve factors enunciated in *Johnson v. Georgia Highway Express, Inc.* affected the decision.[2] *See First Colonial*, 544 F.2d at 1299–1300 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974)); *see also Matter of U.S. Golf Corp.*, 639 F.2d 1197 (5th Cir.1981).

## II. FEE ENHANCEMENT

### A. When is fee enhancement appropriate?

■ In reviewing the *Johnson* factors and the circumstances of the case, however, a court may discover other factors which may warrant adjustment of the lodestar rate. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. at 564, 106 S.Ct. at 3097–98; *In re Lawler*, 807 F.2d at 1211; *see also Copper Liquor Co.*, 684 F.2d at 1093 (citing *Copeland v. Marshall*, 641 F.2d 880, 891–94 (D.C.Cir.1980) (en banc)). The court is not necessarily limited by the fee arrangement between the parties; the lodestar may be increased or decreased depending on the circumstances of the case. *See Blanchard v. Bergeson*, 489 U.S. 87, 93–94, 109 S.Ct. 939, 944–45, 103 L.Ed.2d 67 (1989); *see also Consolidated Bancshares Inc.*, 785 F.2d 1249, 1257 (5th Cir.1986) (high level of expertise in complicated reorganization does not automatically warrant enhancement); *Copper Liquor Co.*, 684 F.2d at 1092–93 (lodestar may be adjusted to reflect contingent nature of suit or quality of represen-

tation); *Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292, 1302–04 (11th Cir.1988) (lodestar may be adjusted based on results obtained); *In re Taxman Clothing Co. Inc.*, 134 B.R. 286, 291 (Bankr.N.D.Ill.1991) (lodestar may be adjusted upward for exceptional results, downward for partial or limited success).

■ Upward adjustments of the lodestar amount have generally been reserved for those cases in which the results obtained have been "rare and exceptional." *See In re Lawler*, 807 F.2d at 1213–14; *Norman v. Housing Authority of City of Montgomery*, 836 F.2d at 1302–04; *In re Taxman Clothing Co. Inc.*, 134 B.R. at 291; *In re D.W.G.K. Restaurants*, 106 B.R. 194, 197 (Bankr.S.D.Cal.1989); *In re Port Royal Land & Timber Co.*, 105 B.R. 72, 77–78 (Bankr.S.D.Ala.1989). Exceptional results are those results that are out of the ordinary, unusual, or rare. *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 880 (11th Cir.1990); *Norman v. Housing Authority*, 836 F.2d at 1202. Nevertheless, even exceptional results do not warrant fee enhancement unless there is specific evidence in the record to show that "the quality of representation was superior to that which one would reasonably expect in light of the fees claimed." *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Grant v. George Schumann Tire & Battery*, 908 F.2d at 880; *accord In re Manoa Finance Co.*, 853 F.2d 687, 688 (9th Cir.1988) (lodestar rate presumed reasonable in absence of evidence to contrary).[3]

---

*v. Marshall*, 641 F.2d 880 (D.C.Cir.1980) (en banc).

**2.** *Johnson* sets out the following twelve factors to be considered in the determination of a reasonable fee: (a) the time and labor required, (b) the novelty and difficulty of the questions involved, (c) the skill required to perform the legal service properly, (d) the preclusion of other employment of the attorney due to the acceptance of the case, (e) the customary fee, (f) whether the fee is fixed or contingent, (g) the time limitations imposed by the case, (h) the amounts involved and the results obtained, (i) the experience, reputation, and ability of the attorneys, (j) the "undesirability" of the case, (k)

the nature and length of the professional relationship with the client, and (*l*) awards in similar cases. *Johnson*, 488 F.2d at 717–719. *See also Kerr v. Screen Extras Guild*, 526 F.2d 67, 70 (9th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976) (adopting the *Johnson* factors); *In re Saunders*, 124 B.R. 234, 236 (Bankr.W.D.Tex.1991).

**3.** Requiring courts to support adjustments to the lodestar rate with specific evidentiary findings supports the presumption of reasonableness accorded the lodestar, and prevents district courts from merely "eyeballing" the request and adjusting the lodestar by an arbitrary percentage. *See Tomazzoli v. Sheedy*, 804 F.2d at 97.

The "results obtained" factor is one of the more significant factors in determining whether the circumstances of a case are so "exceptional and rare" as to warrant a fee enhancement. *See Rose Pass Mines Inc. v. Howard*, 615 F.2d 1088, 1090 (5th Cir.1980); *Wolf v. Frank*, 555 F.2d 1213, 1218 (5th Cir.1977); *In re Hunt*, 124 B.R. 263, 266 (Bankr.S.D.Ohio 1990); *In re Morris Plan Co.*, 100 B.R. at 451. At least two courts have required that all creditors of the estate be paid in full before allowing a fee enhancement. *In re Morris Plan Co.*, 100 B.R. at 454; *In re D.W.G.K. Restaurants*, 106 B.R. at 197. In *Morris Plan Co.*, the court allowed a fee enhancement due to the efforts of counsel in recovering approximately $40 million, which was used to pay all creditors of the estate in full. In *D.W.G.K.*, the court also phrased the enhancement issue in terms of a benefit to the creditors of the estate. The court stated that although the attorneys had displayed great expertise throughout the confirmation process, an enhancement could only be awarded upon a showing that the services benefitted the creditors of the estate, i.e. that the creditors received 100% payment on their claims. *In re D.W.G.K. Restaurants*, 106 B.R. at 197. Similarly, the Fifth Circuit has stated that a high level of expertise in a complicated reorganization does not automatically warrant fee enhancement, because a successful reorganization is precisely the result contemplated by Congress in enacting Chapter 11 of the Code. *Consolidated Bancshares Inc.*, 785 F.2d 1249, 1257 (5th Cir.1986) (citing *In re Union Cartage Co.*, 56 B.R. 174, 178 (Bankr.N.D.Ohio 1986)). In order to qualify as "rare and exceptional," then, the results obtained in any given case must exceed the reasonable expectations of the parties under the Bankruptcy Code.

There can be no doubt that the results obtained in the instant case were rare and exceptional. Debtors' counsel was able to negotiate the resolution of a highly publicized and bitter dispute between Farah, Inc. and Mr. Farah, whereby Farah, Inc. released a $750,000 claim against the estate, agreed to pay Mr. Farah on his consulting contract, and agreed to provide complete health benefits for the debtors for the rest of their lives. In addition, counsel negotiated the forgiveness of a $4 million obligation to the Resolution Trust Corporation, and recovered and sold a World War II aircraft which brought in over $625,000. Counsel also successfully defended the estate at several significant lift stay motions regarding the Farah, Inc. stock that had been pledged as collateral on several loans, including especially the relief from stay sought by the FDIC.[4] The stock, which was worth approximately $3 per share at the time of filing, was ultimately disposed of for approximately $7.25 per share, bringing an additional $1.8 million into the estate. Had counsel been unsuccessful in defending the lift stay motions, the stock would have been sold prematurely, thereby creating large deficiency claims on the part of the secured lenders. Counsel's efforts, combined with the favorable movement of the price of the stock, avoided the creation of such deficiency claims and brought additional revenue into the estate for the benefit of all creditors and the debtors.

Despite the initial assessment that several secured creditors were facing losses exceeding $125,000 each, and that unsecured creditors would likely receive less than a 5% recovery, every creditor of the estate has been or will be paid in full *with interest*; many secured creditors have been paid attorneys' fees as well. The debtors, who were expecting to be able to keep no more than $110,000 in exempt property, now have assets worth approximately $3.5 mil-

---

**4.** The FDIC found a buyer willing to take the FDIC's portion of the shares in bulk at a fixed price per share well below that at which the stock was trading, but high enough to pay the FDIC in full (according to the FDIC). The debtors, through the yeoman's efforts of their counsel, successfully resisted this lift stay action, even convincing the court to reverse field at the last moment (on a motion for reconsideration). Ultimately, the stock was sold at a much higher price, yielding enough money to pay not only the FDIC principal claim but also paying the FDIC postpetition interest and attorneys' fees, and leaving enough excess to pay unsecured creditor claims, administrative claims, and still resulting in a surplus for the debtors.

lion. These are, without a doubt, exceptional results. Coupled with the risk of nonpayment of attorneys' fees at the outset of the case, they justify this court's conclusion that Mr. Krafsur has met the heavy burden of proving an entitlement to an adjustment of the lodestar. All that remains is for the court to determine the amount of the adjustment.

### B. How much of an enhancement is appropriate?

 The Fifth Circuit has adopted specific guidelines for the enhancement of the lodestar. *See Graves v. Barnes,* 700 F.2d 220, 222 (5th Cir.1983). The lodestar may be increased based on the contingent nature of the case after a careful evaluation of the following factors: (1) analysis of the plaintiff's burden, (2) risks assumed in developing the case, and (3) the delay in receipt of payment for services rendered. *Graves,* 700 F.2d at 222–23. A fee enhancement based on the risk of non-payment should only be awarded where counsel has not been adequately compensated in the lodestar amount. *Graves,* 700 F.2d at 224.

While convinced that counsel found the case challenging, the court does not believe that this case is an appropriate candidate for an enhancement based on the risk of nonpayment. The issues in the case were factually and legally complex, but not extraordinarily so. The debtors' liabilities were clearly established, and counsel faced few novel issues of law in handling the case. As the court noted previously, counsel did face a substantial risk of non-payment at the outset of the case; however, the risk of non-payment diminished rapidly as the case progressed under Mr. Krafsur's professional care. Even though risk of non-payment can support a fee enhancement, the court finds that counsel has been adequately compensated for that risk in the lodestar amount, and will make no enhancement on that basis.

 The Fifth Circuit has also recognized fee enhancements made on the basis of superior representation. *Graves v.*

*Barnes,* 700 F.2d at 223. If the enhancement is to be based on quality of representation, the court must assess the manner in which counsel discharged his professional responsibilities, giving careful consideration to (1) the results obtained in the case, and (2) an evaluation of the professional methods utilized in processing the case. *Graves,* 700 F.2d at 223. The extraordinary results in this case speak for themselves. Mr. Krafsur was efficient and fair in both the way he handled the case and the way he billed his time. The original fee application and the billing summary attached thereto reveal an evenhanded and thorough approach to the practice of law. On the basis of the foregoing, the court concludes that the lodestar amount of $119,640.50 does not adequately compensate debtor's counsel for the services rendered, and should be enhanced to reflect the superior quality of representation afforded debtors in this case.

 Unfortunately, there is no uniform standard by which to arrive at a fee enhancement figure. Fee calculation is not an exact science. *Evans v. City of Evanston,* 941 F.2d 473, 476 (7th Cir.1991); *see also Tomazzoli v. Sheedy,* 804 F.2d 93, 97 (7th Cir.1990) (there is no one correct formula for a fee award; therefore, court's calculation is anything but an arithmetical exercise). Because there is no one correct formula, the court necessarily has discretion in choosing among the various alternatives. *Hensley v. Eckerhart,* 461 U.S. 424, 436–37, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). Realizing that fee enhancements by their very nature are subjective, the court has examined a number of alternative approaches to see if, by analogy, an appropriate formula or scheme can be devised.

By his own calculations, counsel for the debtor recovered approximately $9 million for the estate. Had this been a ⅓ contingency fee case, counsel could arguably recover approximately $3 million.[5]

Chapter 7 or 11 trustees are compensated based upon the amount of assets they administer during the pendency of the case.

---

**5.** Of course, as counsel was quick to point out in his brief, counsel has not requested such a fee.

11 U.S.C. § 326(a) (setting upper limits on compensation of trustee).[6] Had counsel been appointed as Chapter 7 or 11 trustee in this case, based upon counsel's estimate that over $19,000,000 in assets have been administered, counsel would conceivably be entitled to compensation of approximately $590,000.

Suppose one were to calculate the amount of interest that the funds recovered by counsel would accrue in one year at the federal judgment rate. From the date of filing, using as principal counsel's estimate of the funds recovered, the interest for one year would be approximately $709,200.

▆▆▆▆ Suppose this had been a class action suit.[7] When a class action results in a common fund for the benefit of the plaintiffs, a court may exercise its equitable powers, in the absence of an established fee arrangement, to award a fee to plaintiffs' attorney from the common fund. *Boeing v. Van Gemert*, 444 U.S. 472, 478–79, 100 S.Ct. 745, 749–50, 62 L.Ed.2d 676 (1980); *Evans v. City of Evanston*, 941 F.2d at 478. This is true even if the class action results in a common benefit, rather than a fund; in such a case, class counsel's fees may be charged to the beneficiaries of the benefit despite the absence of a fund. *Evans v. City of Evanston*, 941 F.2d at 478.

Once a fund has been established, the accepted method for the calculation of class counsel's fee is a "percentage of the fund approach," rather than the traditional lodestar analysis. *See Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 771–72 (11th Cir.1991).[8] The percentage of fund approach has not yet been adopted in the Fifth Circuit. *See In re Terra Drill Partnerships Securities Litigation*, 733 F.Supp. 1127, 1131 (S.D.Tex.1990) (adhering to *Johnson* factors for class action fees rather than common fund approach). Where the percentage of fund approach has been adopted, the benchmark rate is 25%. *See Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. Hawaii 1989); *In re Activision Securities Litigation*, 723 F.Supp. 1373, 1377 (N.D.Cal.1989) (review of reported common fund cases shows that benchmark is around 30%).

Just as class counsel in a class action recovers a common fund for the benefit of the claimants, counsel for the debtor-in-possession in this case recovered a common fund for the benefit of all creditors of the estate. It would not be unreasonable to expect that the compensation for the creation of the fund would come from the fund created. If the percentage of the fund approach were applied in the instant case, counsel could justifiably argue for his entitlement to approximately 25% of the

---

**6.** § 326(a) provides in pertinent part:

> ... the court may allow reasonable compensation under § 330 ... of the trustee for the trustee's services, ... not to exceed fifteen percent on the first $1000 or less, six percent on any amount in excess of $1000 but not in excess of $3000, and three percent on any amount in excess of $3000.

11 U.S.C. § 326(a).

**7.** In a very real sense, a bankruptcy case is much more closely analogous to class action cases than it is to the fee shifting cases which have been the source of our current jurisprudence governing professional fees in bankruptcy. *See Johnson v. Georgia Highways,* and *First Colonial, supra.* In a bankruptcy case, the professional does not pursue a particular defendant to recover a claim for the benefit of an aggrieved party pursuant to some federally created statutory cause of action (as happens in the fee shifting cases). Rather, the professional assists

the trustee (or debtor in possession) in assembling a common pool of assets for the benefit of a class of beneficiaries (the creditors), or assists in conferring a "benefit" on those common beneficiaries (e.g., a plan of reorganization). This is much more akin to the activities of counsel for the class in a class action. Like all analogies, this one breaks down if pushed too far, yet it is a much more satisfactory model than is the fee-shifting model. The only thing fee shifting cases share with bankruptcy cases (apart from the case law on professional fees, of course) is that both involve pursuing federally created entitlements.

**8.** The lodestar analysis has been held to encourage abuse and inefficiency in the common fund context. *See In re Activision Securities Litigation,* 723 F.Supp. 1373, 1378 (N.D.Cal.1989). There is a lesson to be learned here for bankruptcy cases, where the lodestar method also tends to encourage abuse and inefficiency.

"fund" created by his efforts, or $2,250,-000.

Under any of the foregoing methods of calculation of compensation, it is clear that counsel would be entitled to an amount well in excess of the lodestar rate of $119,640.50. Although not determinative, such a comparison lends credibility to the court's previous finding that the lodestar amount, at least in this instance, does not adequately or reasonably compensate debtor's counsel for the services rendered in this case. An enhancement of a considerable amount in excess of the current fee request would be supportable under any of these alternative theories of compensation—and at least one of those theories (the common fund theory used in class action cases) is more closely analogous to bankruptcy cases than are the traditional factors derived from the fee-shifting cases.

The fee enhancement cases in bankruptcy are rare indeed, though not entirely unheard of. Those cases should at least be acknowledged in this process, regardless of the theoretical construct upon which they rely, simply because they represent the sense of what is and is not appropriate in the bankruptcy context from the one person deemed to be an expert on these things—the bankruptcy judge. In an early case, one court acknowledged the propriety of fee enhancements, but also adverted to a continuing concern about efficiency in the administration of bankruptcy cases, and ultimately permitted a 20% fee enhancement. *In re Garland Corp.*, 8 B.R. 826 (Bankr. D.Mass.1981). In a similar vein, a court in New Hampshire pointed out the inherent public interest that accompanies all fee awards in bankruptcy cases. *In re Sanders Technology Systems, Inc.*, 21 B.R. 40 (Bankr.D.N.H.1982).

 Cases decided since the Supreme Court's decision in *Delaware II* have been reluctant to move past the 30% cap which that case in *dicta* set on fee enhancements in fee shifting cases. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air II*, 483 U.S. 711, 107 S.Ct. 3078, 3089, 97 L.Ed.2d 585 (1987); *see also In re One City Centre Assoc.*, 111 B.R.

872, 879 (Bankr.E.D.Cal.1990) ($35 per hour on 922 hours, plus $10 an hour on another 106 hours); *In re D.W.G.K. Restaurants, Inc.*, 106 B.R. 194, 197 (Bankr.S.D.Cal.1989) (11%); *In re Yankton College*, 101 B.R. 151, 169 (Bankr.D.S.D.1989) (15%); *see generally In re Churchfield Management & Inv. Corp.*, 98 B.R. 838 (Bankr.N.D.Ill. 1989) (excellent analysis and comparison of fee-shifting and common fund cases).

The difficulty with fee enhancement here is that virtually every bankruptcy court has felt constrained not to stray from the case law that has imposed onto bankruptcy fees the construct of compensation applicable to fee-shifting cases. The fit is not a good one in general, as this court has previously noted. *See In re Temple Retirement Community*, 97 B.R. 333, 341 (Bankr. W.D.Tex.1989). When one looks at why the Supreme Court so severely limited fee enhancement in the typical fee-shifting case, it is painfully obvious how far removed such cases really are from bankruptcy for purposes of determining a fee enhancement award. The plurality in *Delaware II*, for example, indicated its concern that enhancing fees for risk of loss forces losing defendants to compensate plaintiff's lawyers for not prevailing against defendants in other cases. *Delaware II*, 107 S.Ct. at 3086. In bankruptcy, this is not an issue at all, where there are no plaintiffs or defendants, and "prevailing" is simply not relevant. The Supreme Court also noted that enhancement actually penalizes defendants with the strongest cases, authorizing the highest fees in cases least likely to be won (and least desirable to be encouraged). *Id.* Again, penalizing defendants with strong cases is a notion completely foreign to bankruptcy. Finally, the Supreme Court in *Delaware II* noted that awarding an enhancement premised on the risk the case might not be won ends up being no test at all, for that is a risk in every case. *Id.* And once again, the point is perfectly valid when applied to fee-shifting cases, and perfectly irrelevant to bankruptcy.

Based on the foregoing, this court concludes that the 30% cap suggested in *Dela-*

*ware II* is not a cap applicable to enhancement awards in bankruptcy cases, because the rationale that supports that cap has no application to bankruptcy. That bankruptcy courts use (indeed, are constrained to use, under principles of *stare decisis*) the same general standards for evaluating fees in bankruptcy cases as do courts in setting fees in fee-shifting cases does not require those courts to employ the same methodology for setting an enhancement award.

Freed from that constraint, the court is still nonetheless constrained by considerations much closer to the bankruptcy process itself not to permit the fee enhancement process to fall victim to the windfall approach to fees which pervades the award of fees in the common fund and contingent fee cases. One reason for this is that the economics associated with the risk of losing the case that motivate such windfalls in those kinds of cases are not present in bankruptcy.[9] Another is that there really are inherent public interests at work in bankruptcy, a system which would not exist but for the power invested in Congress by the Constitution to enact a federal law permitting this extraordinary remedy. The public has an inherent interest in assuring that such a system have integrity, and not be a harbor for the venalities of professionals who represent (for the most part) [10] fiduciaries. *See Sanders Technology Systems, Inc., supra* at 43.

With these competing considerations in mind, the court finds that, in this case, doubling the fee is an appropriate enhancement that appropriately recognizes the extraordinary contribution of counsel to the success of this case, while remaining faithful to the public's interest in discouraging professionals from succumbing to excessive greed.

### CONCLUSION

The court, having determined that the circumstances of the case merit an enhancement for rare and exceptional results obtained, concludes with confidence that Mr. Krafsur is easily entitled to a fee enhancement of two times lodestar, bringing the total fee award to $239,281.00.

So ORDERED.

---

**9.** The risk of there not being enough assets available for distribution to pay administrative expenses is, in the most general sense, a similar risk of loss, but is a risk much more in the control of the attorney than are the risks in the class action or personal injury suit, which come from the vagaries of juries and such. The attorney in a bankruptcy case, it is true, risks the vagaries of the local bankruptcy judge, but that is hardly the same sort of thing. Otherwise, the attorney has the opportunity to evaluate the client's financial wherewithal before taking the case, and often even takes a retainer to further minimize the risk of nonpayment. It is also, in general, easier under the disciplinary rules of most states, to withdraw from a bankruptcy case than to withdraw from a typical class action or personal injury case.

**10.** Creditors' Committees may not be "fiduciaries" in the way that trustees and debtors-in-possession are, but their counsel are also compensated out of the estate.