In the Matter of FIRST AMERICAN HEALTH CARE OF GEORGIA, INC., and its wholly owned subsidiaries, Debtors.

FIRST AMERICAN HEALTH CARE OF GEORGIA, INC., et al., Plaintiff,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES THROUGH Donna SHALALA, Secretary of the United States Department of Health and Human Services, Health Care Financing Administration, and Blue Cross/Blue Shield of Iowa, a/k/a ISAD Health Services Corporation, Defendants.

Bankruptcy No. 96–20188.

United States Bankruptcy Court,
S.D. Georgia,
Brunswick Division.

Feb. 23, 1996.

Kathleen Horne, Savannah, GA, for debtors.

Nina L. Hunt, Spec. Atty. for U.S. Atty. Gen., Atlanta, GA, for defendants.

## ORDER ON DEBTORS' COMPLAINT FOR TURNOVER OF PROPERTY OF THE ESTATE AND MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION

LAMAR W. DAVIS, Jr., Bankruptcy Judge.

Debtors' Chapter 11 cases were filed February 21, 1996. An adversary proceeding seeking the above relief was filed February 22, 1996, and set for a hearing at Noon on February 22. Due and sufficient notice to Defendants was given of the scheduled hearing and all Defendants appeared, through counsel, at the hearing.

### FINDINGS OF FACT

Debtor, First American Health Care of Georgia and its wholly-owned subsidiaries ("First American"), are the largest privately owned home health care provider in the United States. Collectively, they operate 450 offices in 22 states, employ 15,000 people and serve 32,000 patients, accumulating over nine million separate visits annually. Ninety-eight percent of First American's patients are Medicare-eligible and homebound. Eighty-two percent of them are over 70 years of age.

Under current law and regulations First American's subsidiaries operate under provider agreements with the United States Department of Health and Human Services ("HHS"). Under these agreements the Medicare program reimburses First Ameri-

can for the reasonable costs of allowable services provided by the subsidiaries and for home office costs of the parent corporation. Under the program, payments estimated to be equivalent to the value of services rendered are made every two weeks, known as "periodic interim payments," or "PIPs." First American has been receiving PIPs in the approximate amount of $22 million every two weeks since the last adjustment in June 1995.

These payments are administered for HHS by the Health Care Financing Administration ("HCFA") utilizing Blue Cross/Blue Shield of Iowa as fiscal intermediary. Pursuant to its duty HCFA has audited First American and as a result of a long-term investigation the Parent, First American Health Care of Georgia, Inc., and four of its officers and employees, were indicted on numerous charges, including Medicare fraud. The Parent corporation and Robert J. Mills were convicted of Medicare fraud and other charges, but none of the home health care providers, the subsidiaries, were indicted.

On February 9, 1996, HCFA notified First American that the $22 million PIPs due on February 14 would be withheld and on February 16 advised that all future PIPs would be suspended as authorized by 42 C.F.R. 405.370, et. seq.

Because ninety-eight percent of First American revenues originate with HCFA, First American will immediately cease business, and cease to deliver home health services, unless the relief it seeks is granted. In that event, 15,000 employees will be unemployed and 32,000 elderly, home-bound patients will be without a home health care provider, at least temporarily. In approximately 50 communities spread over 13 of the 22 states in which it operates, First American believes that there is currently no other home health agency doing business. In these communities, the lapse of services could be substantially longer than in others, but even in communities where competitive agencies serve, their ability to absorb First American's patients, and the patients' ability to access them is unknown. The likelihood of harm to many of these patients is obvious, should First American suddenly vanish.

On February 20, prior to the filing of this Chapter 11 case, Robert J. Mills and his wife, Margie B. Mills, resigned as officers and directors of each of the debtor companies. The board then hired Chamberlain and Cansler, an independent management firm, whose principals were retained to serve as Chief Executive Officer and Chief Financial Officer of First American.

First American sought and obtained an interim order of this Court, on an emergency basis, approving the retention of Messrs. Chamberlain and Cansler to serve, completely independent of First American's Board of Directors and shareholders,[1] all of whom expressly consented to delegate all corporate governance to the new independent managers. First American believes that this substitution of new management will help rebuild its integrity, especially in the eyes of HCFA, and hopes eventually that all overpayment issues between them can be resolved. In the meantime, it seeks turnover of the February 14 PIPs, and temporary and permanent injunctive relief to force HCFA to continue bi-weekly PIP payments, in order to preserve the business as a going concern and to enable it to propose a plan of reorganization which contemplates sale of First American to an outside company.

Under Medicare regulations, the payment of PIPs to providers is provisional in nature. At the close of each year a cost report is filed, audited by the fiscal intermediary and a "Notice of Program Reimbursement" or NPR is issued, which states the amount of any overpayment. A provider which disputes the NPR may seek administrative relief, and after exhaustion of those remedies may seek judicial review.

In this case First American has received no NPR for any year since 1988. Counsel for HHS states that his client believes that for 1988–1992 the total overpayment is ap-

---

**1.** All shares of stock in First American are owned by Mr. and Mrs. Mills and their three children.

proximately $25 million. HHS has no estimate of how much of that amount is attributable to fraud and how much is non-fraud related. Evidence revealed that while 1988 is the last year in which there is a completed audit, preliminary figures exchanged by HCFA and First American reveal alleged overpayments of $1.2 million in 1989, $1 million in 1990, and $2.5 million in 1991. The 1992 figures will not be finished until at least July 31, 1996, but HCFA's claimed overpayment for 1992 is in the $8 million to $20 million range. First American concedes none of these amounts, and no administrative review has been initiated since no NPR has been issued for any of these years. It is estimated that the results of audits for 1993–1995 will not be completed for 4–5 years.

Clearly the trend line in these preliminary figures is disturbing and given the indictment and conviction previously mentioned, it is clear, for now,[2] that the Medicare system, that is the United States and its people have been defrauded. This factor, however, is not fatal to First American's eligibility for relief under Chapter 11.

## CONCLUSIONS OF LAW

### 1. Subject Matter Jurisdiction

█ In its capacity as a Debtor, First American is protected by the provisions of 11 U.S.C. Section 362 from certain, but not all, actions of creditors. It is also entitled to recover all property of the estate under 11 U.S.C. Section 542. Defendants contend, however, that this Court lacks subject matter jurisdiction of this particular adversary proceeding because of the provisions of 42 U.S.C. Section 405(h) which provides:

The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as

herein provided. *No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of tide 28, United States Code, to recover any claim arising under this title.*

42 U.S.C. § 405(h) (emphasis supplied). As originally drafted, 42 U.S.C. Section 405(h) precluded bankruptcy jurisdiction over all disputes arising out of the Medicare program by "prohibiting any action under 'section 24 of the Judicial Code of the United States,' which section (codified at 28 U.S.C. § 41) contained virtually all of the jurisdictional grants to the district courts including bankruptcy jurisdiction." *In re St. Johns Home Health Agency, Inc.,* 173 B.R. 238, 244 (Bankr.S.D.Fla.1994). In 1948, Congress revised the Judicial Code and recodified district court jurisdictional sections although effectively leaving the interpretation of Section 405(h) unchanged. *Id.* at 244.

However, in 1984, in an effort to completely revise and expand the scope of bankruptcy jurisdiction, Congress enacted 28 U.S.C. Section 1334 which took effect on July 10, 1984. When enacting Section 1334 Congress had the opportunity to exclude actions covered by 405(h), but instead omitted any reference to the Medicare jurisdictional preclusion provisions and, therefore, granted concurrent jurisdiction of Section 405(h) matters to bankruptcy courts. See *In re Shelby County Healthcare Services of Al., Inc.* 80 B.R. 555, 560 (Bankr.N.D.Ga.1987); *In re Town & Country Home Nursing Services, Inc.,* 963 F.2d 1146, 1155 (9th Cir.1992) (Section 1334 is a broad jurisdictional grant over matters that have an effect on the estate and it "allows a single court to preside over all of the affairs of the estate, which promotes a 'congressionally-endorsed objective: the efficient and expeditious resolution of all matters connected to the bankruptcy estate' ") (citations omitted). Moreover, effective July 18, 1984, *only eight days subsequent to the enacting of Section 1334,* Congress revised

---

**2.** Appeals of the convictions are anticipated and this conclusion is subjection to revision in the event of a successful appeal.

Section 405(h) and substituted "section 1331 or 1346 of title 28, United States Code," for Section 24 of the Judicial Code of the United States. Pub.L. 98–369, § 2663(a)(4)(D), 98 Stat. 1162 (1984). Obviously, the language of Section 405(h) omits any reference to the preclusion of Medicare claim jurisdiction from cases arising under 28 U.S.C. Section 1334.

Although the possibility exists that the exclusion was unintentional, when considering the proximity of the enactment of both statutes along with the significant changes in bankruptcy jurisdiction that Section 1334 established, I hold that the plain meaning of Section 405(h) should be enforced, and clearly, this Court's jurisdiction under Section 1334 was not circumscribed. *See Health-master Home Health Care, Inc. v. Shalala (In re Healthmaster Home–Health Care, Inc.)*, Case No. 95–10548, Adv.Pro. 95–1031, slip op. at 3–4 (Bankr.S.D.Ga., April 13, 1995). In short, within a period of eight days, Congress, when presented with two opportunities, failed to exclude from the jurisdiction of the bankruptcy courts all actions arising under the Medicare program. I therefore find that this Court has subject matter jurisdiction over this action. *See In re Town and Country Home Nursing Services, Inc.*, 963 F.2d at 1151.

Eleventh Circuit precedent also supports a finding of jurisdiction over this matter. *See V.N.A. of Greater Tift County, Inc. v. Heckler*, 711 F.2d 1020, 1031–33 (11th Cir.1983). The Eleventh Circuit, relying on the All Writs Statute codified at 28 U.S.C. Section 1651, found in a non-bankruptcy context that the district court had jurisdiction to issue a status quo injunction pending resolution of Medicare reimbursement disputes in certain circumstances. The Court stated that its "holding that there is fundamental jurisdiction in the case of truly wrongful agency action also mitigates any extremely ill effects of preclusion." *Id.* at 1032. The Court found that the preclusion in 405(h) would be obviated if there existed (1) a virtual certainty of irreparable injury, (2) a similar certainty of success on the merits, (3) minimal harm

to the agency, in the sense of the disruption of its processes, and (4) the public interest clearly favoring the assumption of jurisdiction. Here, all of these requirements have been satisfied.

 Finally, the existence of an administrative remedy, not yet exhausted, does not defeat this Court's jurisdiction. *See In re Town & Country Home Nursing Servs.*, 112 B.R. 329, 334 (9th Cir. BAP 1990) ("where there is an independent basis for bankruptcy court jurisdiction, exhaustion of administrative remedies pursuant to other jurisdictional statutes is not required"). Administrative remedies that are inadequate need not be exhausted. *See Coit Independence Joint Venture v. Federal Savings and Loan Ins. Corp.*, 489 U.S. 561, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989); *Greene v. United States*, 376 U.S. 149, 163, 84 S.Ct. 615, 623, 11 L.Ed.2d 576 (1964); *Smith v. Illinois Bell Telephone Co.*, 270 U.S. 587, 591–592, 46 S.Ct. 408, 410, 70 L.Ed. 747 (1926) ("[P]ublic service company is not required indefinitely to await a decision of the rate-making tribunal before applying to federal court for equitable relief."). The procedural posture in which the Debtors find themselves offers no immediate avenue of review of the preliminary determination of overpayment and withholding of ongoing payments. *See* 42 C.F.R. §§ 405.370–373.

In the present matter, Blue Cross has unilaterally terminated the disbursements of PIPs to Debtor based on allegedly reliable evidence that circumstances exist giving rise to a suspension of payments caused in part by fraudulent or willful misrepresentations. While there appears to be a mechanism for seeking administrative, and ultimately, judicial review of that decision, the remedy is in fact illusory. "[T]he lack of a reasonable time limit in the current administrative claims procedure renders it inadequate ..." *Coit Independence Joint Venture v. Federal Savings and Loan Ins. Corp.*, 489 U.S. at 587, 109 S.Ct. at 1376. It is beyond question that the Debtor would have long ceased doing business by the time the administrative

procedures of 42 C.F.R. §§ 405.370–375 are exhausted. Testimony revealed that the audits for the years 1989–1991 are complete, but in dispute. The audit for the 1992 fiscal year will not be completed until July of 1996. At this rate, it would be optimistic to expect a final accounting within five years. Although the Debtor willingly accepts the terms of the Medicare Act, I find that the five to eight year administrative appeal process unreasonably burdens the Debtor, effectively denying the litigant its day in court and, therefore, for the purposes of this temporary restraining order, Debtor is entitled to a *de novo* determination on the merits of its contentions.

For the foregoing reasons, the Motion to Dismiss of the United States based on lack of subject matter jurisdiction is denied.

### 2. *Issuance of a temporary restraining order*

■ The Eleventh Circuit has set out the following four requirements for the issuance of a temporary restraining order:

1) a showing of the movant's substantial likelihood of success on the merits;

2) a showing that the movant will suffer irreparable harm without the relief sought;

3) proof that the threatened injury outweighs any harm which might result to the defendant; and

4) a showing that the public interest will not be disserved by granting the relief sought.

*Snook v. Trust Co. of Georgia Bank of Savannah,* 909 F.2d 480, 483 (11th Cir.1990).

1. *First American has shown a substantial likelihood of success on the merits because it is undisputed that the PIPs are property of the estate.*

First American is entitled to bi-weekly PIPs because it continues to provide reimbursable services to Medicare beneficiaries under the Provider Agreements. While the Defendants have argued that they should be allowed to exercise the equitable remedies of recoupment, the doctrine of recoupment does not bar the Debtors' request.

■ Recoupment is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action for the purpose of abatement or reduction of such claim. *See Collier on Bankruptcy,* § 553.03, at 553–15–17 (15th ed.1995). Recoupment differs from setoff in that it arises only where the creditor's claim arises from the same transaction as the debtor's claim. The Third Circuit examined the theory of recoupment of Medicare overpayments in a bankruptcy context and determined that it did not apply since the same transaction requirement could not be met. As recognized by the Third Circuit, Medicare payments are made on an annual basis, therefore, "reimbursement payments made for any one year arise from transactions wholly distinct from reimbursement payments made for subsequent years." *In re University Medical Center,* 973 F.2d 1065, 1080 (3rd Cir.1992). Thus, any payments made for previous years are "independently determinable" and were made "for services completed distinct from those reimbursed" for other years. *Id.* at 1081. The "entire account reconciliation process established by the Medicare Act and Regulations work on an annual basis." *Id.* Thus, the government may only recoup postpetition any overpayments made for services provided from January 1, 1996, to the petition date. *See In re Consumer Health Services of America, Inc.,* 171 B.R. 917 (Bankr. Dist.Col.1994) (adopting *University Medical Center* conclusions with respect to set off and recoupment rights).

■ Even if the same transaction requirement could be met. since recoupment is any equitable remedy, on the facts of this case this Court should not permit HCFA to exercise such a remedy. As the Court recognized in *Healthmaster,* the doctrine of recoupment should not be applied to allow the arbitrary withholding of all monies due so as to effectively shut down a business which provides needed services and employment for

thousands of people, particularly where the precise amount the Defendants seek to recoup has not been established. Indeed, for the years 1989, 1990 and 1991, where the audit process has reached some measure of finality, the total overpayment is less than $5 million. Defendants' suspension of only one PIP exceeds that sum by 400%. Under the evidence most favorable to the Defendants, $17 million of the first PIP in issue is property of the estate *beyond question.*

2. *Irreparable harm will result if the relief sought by the Debtors is not granted because the Debtors will be unable to continue to operate and will force approximately 15,000 workers into unemployment and leave 32,000 patients abruptly without health care, many of whom may have no alternative provider.*

The irreparable harm in this case clearly outweighs any inconvenience or potential harm to the Defendants. Without regular payment of PIPs, First American cannot meet basic overhead obligations or payroll. It will cease to exist. If it cannot meet its payroll obligations, the employees will quit or be laid off and services to approximately 32,000 patients will abruptly cease. Some of these patients require daily visits for administration of medications without which the patients' lives may be endangered. Some of these patients live in such rural areas as to have no alternative qualified home care provider which could provide the services currently provided by the Debtors. Thus, irreparable harm to the 32,000 patients and the Debtors and their employees is certain if the requested relief is not granted.

3. *The threatened injury to Parent and its providers far outweighs any harm that may result to the Defendants.*

If the relief sought by Parent and its providers is not granted, the Debtors are out of business, its approximately 15,000 employees will be out of work, and approximately 32,000 patients will be without, at least temporarily,

needed home health care services. Conversely, the potential harm to the Defendants, if any, is completely pecuniary, does not affect people's health and well-being, is less immediate in effect, and more easily corrected at a later date than the sudden termination of health care services to infirm, disabled, or poor people. *See Healthmaster* at 6. Ironically, by granting the Debtors' request, the financial interests of the Defendants are more likely to be improved. The Defendants' chances to collect on any alleged overpayment will be enhanced by the Debtors' continued operations. Thus, the balance of potential harm clearly supports granting the relief sought.

4. *The public interest will be best served by granting the relief sought.*

Finally, the public interest will not be disserved by granting the relief sought. In fact, the public interest provides the most compelling reason for granting the relief requiring the Defendants to cease withholding payments and turnover any funds previously withheld. As discussed above, only continuation of cash flow into the Debtors will allow the Debtors to continue to provide services to Medicare beneficiaries. Home health care services ensure that approximately 32,000 Medicare beneficiaries nationwide that have serious health conditions are monitored, have their wounds cleaned and dressed, have their catheters changed, are provided with physical therapy, administered sometimes life-sustaining medications, and otherwise given treatment necessary to maintain health and life. In some areas, no other home health care provider exists which could immediately substitute for the Debtors and assume these responsibilities. While the public has an interest in insuring that public funds are properly spent on such programs as Medicare, no judicial determination has yet been made which establishes the extent that public funds have been improperly spent by the providers and the real human consequences of cessation of the PIPs far outweighs that interest.

### ORDER

This case presents an excruciatingly difficult decision. Beyond sorting out the juris-

dictional morass, the Court has before it a debtor with a tarnished background which surely owes some measure of Medicare overpayments to the United States. Unfortunately, and for reasons I cannot fathom, the United States' procedures for establishing the precise amount of those overpayments have broken down. This Debtor has yet to be informed the precise amount of overpayment the United States contends it is liable for since 1988. It will not be told for four or five more years how much overpayment it may owe for 1995. That state of facts reveals an abominable mess in a system so critical to the well-being of many citizens, but. in which fiduciary-like stewardship of public funds should be paramount, as to be incomprehensible.

At the risk of contributing to the loss of public funds, however. I am compelled to conclude that the Defendants' suspension of PIPs when they have no clue as to how much Debtor owes, and Defendants' threat to withhold all future PIPs cannot be condoned. Those acts infringe on First American's right to use property of the estate and constitute, or will constitute, a violation of 11 U.S.C. Section 362. IT IS THEREFORE ORDERED that:

1) Defendants remit *instanter,* by wire transfer, to First American the entire PIP which came due on February 14, 1996.

2) Defendants transmit all future PIPs as and when due in accordance with the procedures in place prior to the suspension of PIPs.

3) Defendants are temporarily restrained and enjoined from withholding future PIPs pending further order of this Court.

4) The parties appear at a hearing to consider issuance of a preliminary injunction which will be held at 10:00 o'clock a.m., on Monday, March 4, 1996, Room 228, United States Courthouse, Savannah, Georgia.