In the Matter of FIRST AMERICAN HEALTH CARE OF GEORGIA, INC. and its wholly owned subsidiaries listed on Exhibit "A", Debtors.

Bankruptcy Nos. 96–20188 through 96–20218.

United States Bankruptcy Court, S.D. Georgia, Brunswick Division.

Aug. 4, 1997.

M. Tyus Butler, Savannah, GA, for debtor.

### ORDER ON APPLICATION FOR ENHANCEMENT OF COMPENSATION

LAMAR W. DAVIS, Jr., Bankruptcy Judge.

On May 22, 1997, an application was filed jointly by professionals who served the Debtors in the above cases seeking $700,000.00 enhancement in the compensation previously awarded them to be allocated by mutual agreement of the applicants: Chamberlain and Cansler, the court-appointed independent managers hereinafter referred to as "C&C;" and four law firms appointed to serve in varying roles: Lamberth, Bonapfel, Cifelli and Stokes (hereinafter "Lamberth Bonapfel"); Inglesby, Falligant, Home, Courington and Nash (hereinafter "Inglesby Falligant"); Reed, Smith, Shaw and McClay (hereinafter "Reed Smith"); and Nelson, Mullins, Riley and Scarborough (hereinafter "Nelson Mullins"). Objections were filed by IHS of Brunswick, Inc., the post-confirmation debtor, and by the United States Trustee.[1] A hearing to consider the application was held on July 18 and based on the evidence I make the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Debtors, previously the country's largest private home health care company, filed 31 separate Chapter 11 cases on February 21, 1996. Debtors collectively employed 15,000 in the home health care business in 22 states and served 32,000 patients. The cases were filed as a result of the impending cessation of Medicare payments ("PIPs") made by the United States Health Care Financing Administration ("HCFA") to reimburse the Debtors for the cost of home health care visits, which at filing amounted to $22 million every two weeks and accounted for over 98 percent of Debtors' revenue. The cessation of PIPs followed the conviction of the parent debtor corporation and two of its principal shareholders, Jack and Margie Mills, on various charges of Medicare fraud in late 1995. Immediately prior to the filing of these cases, the Mills negotiated with Integrated Health Services, parent of IHS of Brunswick, Inc., for the merger of Debtors with a subsidiary of IHS, resigned their positions as executive officers of Debtors, and elected, in their capacity as controlling shareholders, C&C to serve as new, independent managers of the Debtors.

Immediately upon the filing of these cases, Debtors' prior counsel, Alston & Bird, filed suit against the United States seeking an injunction against HCFA's cessation of PIPs in order to preserve Debtors' ability to operate. On February 23, 1996, this Court issued an order granting that relief on an interlocutory basis. *See Matter of First American Health Care of Georgia, Inc.*, 208 B.R. 985 (Bankr.S.D.Ga.1996). Debtors thereafter, through the services of these applicants, stabilized the business, sought to re-establish credibility with HCFA and pursued the merger with IHS, which as proposed promised a 100 percent payment of all claims, including those of the United States, as well as a substantial return to shareholders.

Because of a gross underestimation by the Mills of the magnitude of the claim of the United States for Medicare overpayments to Debtors, the merger agreement as initially drafted was infeasible. As a result, the applicants realized that the merger would need to be renegotiated. As a result of sometimes herculean, always high-quality professional effort, the Debtors ultimately were able to renegotiate the merger so that the United States' claim, which the Mills estimated at $50 million, but which was asserted to be as high as $700 million, was settled for a total of

---

**1.** Ms. Eve Goldstein, counsel representing the United States Department of Health and Human Services, also voiced an objection at the hearing.

$255 million. IHS, which initially agreed to pay approximately $277 million for the business, raised its offer to a total of $329 million, $150 million at closing and the balance in the form of future long-term payments. The Mills reduced their payout from $53 per share to $26 per share;[2] and the non-insider option holders received the same amount per option.[3]

Debtors filed a second amended and restated plan which incorporated the new merger agreement on September 13, 1996, a confirmation hearing was held on October 3, 1996, the plan was confirmed October 4, and the merger closed on October 16, essentially the first business day after the appeal time had expired on this Court's Order of Confirmation. As part of confirmation, the Court ordered that an amount be escrowed for the payment of professional fees in the amount of $2,896,000.00 which included sums for these applicants, and others. IHS, however, assumed liability for Debtors' obligations, including any potential additional fees:

> The new parent and the reorganized Debtors shall be jointly and severally liable for any amounts allowed as Professional Compensation that are not paid from escrowed funds.

Second Amended and Restated Plan of Reorganization, p. 16, ¶ 5.01 (b).

In the prosecution of this case, the issue of professional compensation has of course arisen before. Pursuant to precedent in this circuit,[4] this Court in 1995 established a Chapter 11 lodestar range with a floor of $150 and a ceiling of $175 per hour or higher if extraordinary factors existed. *See Matter of River Landings,* 180 B.R. 701 (Bankr. S.D.Ga.1995). Recognizing the passage of time since *River Landings* and the "magnitude, complexity, and time pressures inherent in this case," I ordered an interim increase in the Southern District's lodestar rate in this case to $200 per hour. *See*

*Interim Order on Fee Applications and Notice of Preliminary Hearing,* August 26, 1996, Doc. No. 434. That Order also provided that an evidentiary hearing would be held at a later time "to establish whether, for the particular circumstances of this case, a higher prevailing market rate is applicable."

On October 30, 1996, post-confirmation, I held that because of the unique nature of these cases, the "relevant legal community" for purposes of awarding fees was "national, not local," in scope and accordingly the $200 interim lodestar rate would not, *per se,* limit the fee awards. I therefore set a hearing to consider evidence of the "prevailing market rate in the metropolitan area in which the applicant primarily practices for lawyers of reasonably comparable skills, experience and reputation." *See* Doc. No. 608.

Affidavits filed with the Court to support lodestar rates sought by the applicants established that, for lawyers of the highest skill, reputation and experience in major metropolitan areas specializing in areas relevant to this type of health provider reorganization, comparable rates range between $175.00 and $350.00 per hour. *See* Doc Nos. 665, 667, 669 and 670.

The application for employment of C&C quoted its rates for professional services as follows:

> (a) The Company will pay compensation to the Independent Manager at the rate of $250.00 per hour for Mr. Chamberlain's time and $200.00 per hour for Mr. Cansler's time, provided that they will not charge any hours in excess of 100 total hours per week, and provided, further the total amount due for any two week period will not exceed $45,000.00.

Exhibit "B", Doc. No. 14, ¶ 2(a). The engagement letter made no specific mention of enhanced fees for results obtained. A $20,-000.00 retainer was paid C&C. Orders allow-

---

2. Because the Mills agreed to receive deferred payments, when considering the time value of money, their approximate distribution was actually between $18 and $20 per share.

3. The option holders were all "cashed out" upon confirmation at the full $26 per option price and did not receive any deferred compensation.

4. *See Norman v. The Housing Authority of the City of Montgomery,* 836 F.2d 1292 (11th Cir. 1988).

ing compensation to C&C have approved fees of $795,425.00 at hourly rates of $250 and $200.

The application for employment of Lamberth Bonapfel explained its charges for professional services as follows:

> The Firm charges a reasonable fee, taking into account the time and value of services rendered. Currently, time is generally charged at rates ranging from $125 to $210 per hour for attorney time and $60 per hour for paralegal time. Other relevant factors taken into account in setting a reasonable fee include the amounts involved and the results achieved in the representation, the novelty and complexity of the issues presented, and any time constraints imposed by the client or the circumstances. . . .
>
> The attached Attorney Resume sets forth the names, qualifications, and current hourly rates of the Firm's attorneys. *Each attorney's hourly rate is subject to adjustment in accordance with economic conditions and changes in his or her qualifications experience and ability.*

Firm Resume, Doc. No. 8. (emphasis added). A $225,000.00 retainer was paid Lamberth Bonapfel. Previous orders allowing interim compensation to Lamberth Bonapfel approved fees of $1,031,551.20 at hourly rates for the lead attorneys of $235.00.

The application for employment of Inglesby Falligant set forth its terms of employment as follows:

> Attached hereto is a Firm Description which describes the qualifications of the Firm and its current attorneys and the *terms and conditions of employment, including hourly rates currently charged* by the Firm.

Doc. No. 9, Appendix "A" (emphasis added).

> The compensation is for services rendered or to be rendered in contemplation of, and in connection with this Chapter 11 case and *the Firm has not been promised or guaranteed any future payment for its services other than at the standard hourly rates* of its attorneys upon approval by the Bankruptcy Court.

Doc. No. 31, ¶ 2 (emphasis added). A $150,-000.00 retainer was paid to Inglesby Falligant. Previous orders allowing interim compensation to Inglesby Falligant approved fees of $153,210.18 at hourly rates for lead counsel of $160.00.

The application for employment of Reed Smith quoted its rates for professional services as follows:

> Subject to Court approval in accordance with Section 330(a) of the Code, compensation will be payable to the Firm on an hourly basis, plus reimbursement of actual, necessary expenses incurred by the Firm. The principal attorneys presently designated to represent the Debtors, and their current standard hourly rates, are. . . .
>
> The hourly rates set forth above are the Firm's standard hourly rates for work of this nature. *These rates are set at a level designed to fairly compensate the Firm for the work of its attorneys* and paralegals and to cover fixed and routine overhead expenses. The hourly rates set forth above are *subject to periodic adjustments to reflect economic and other conditions, including increased experience* of professionals rendering services.

Doc. No. 42, ¶ 5 (emphasis added).

> *The Firm intends to apply for compensation* for professional services rendered in connection with these Chapter 11 cases *subject to approval of this Court* and in compliance with applicable provisions of the Bankruptcy Code, *on an hourly basis,* plus reimbursement of actual, necessary expenses and other charges incurred by the Firm.

Doc. No. 42, Declaration of Eugene Tillman, p. 2 (emphasis added). A $25,000.00 retainer was paid Reed Smith and Debtors agreed to maintain the retainer at a level $15,000.00 above accrued fees and costs. Previous orders allowing interim compensation to Reed Smith approved fees of $239,294.63 at hourly rates for lead counsel of $260.00.

The application for employment of Nelson Mullins quoted its rates for professional services as follows:

> NMR&S is familiar with the Debtors' legal needs and has the expertise and ex-

perience to represent the Debtors with respect thereto. Attached hereto as Appendix 1 is a list of the attorneys and paralegals who will be primarily responsible for providing representation to the Debtors, including their qualifications, experience, and hourly rates currently charged. *NMR&S's requested compensation for professional services rendered for Debtors shall be based upon the time expended to render such services and at billing rates commensurate with the experience of the person performing such services, and will be computed at the hourly rates customarily charged by NMR&S for such service.* Expenses will be charged at the actual cost incurred subject to the applicable laws and local rules.

Doc. No. 91, Exhibit "B," ¶ 4 (emphasis added). Previous orders allowing interim compensation to Nelson Mullins approved fees of $1,211,867.30 at hourly rates for lead counsel of $250.00.

In short, each firm disclosed its standard hourly rates or something closely akin to it as the sole basis for compensation. None of the professionals expressly reserved any right to increased compensation except to the extent that there might be periodic adjustments in the firm's standard hourly rates. Compensation already awarded these applicants collectively totals $3,432,348.20. The aggregate enhancement sought to be shared by the professionals is $700,000 or slightly over 20 percent. Total compensation to all professionals in this case exceeds $6 million.

The applicants contend that enhancement is supported by the fact that a large, complex, multi-party case of national significance was prosecuted to confirmation efficiently, paying all claims in full, returning dollars to equity security holders, and at considerable savings to the merger partner. The objecting parties stipulate that excellent work was done by the professionals, that an excellent outcome was achieved, but contend that the criteria for enhancement is not met under applicable authority because (1) the fee awards already made adequately compensate the professionals for their excellent work; (2) the applicants are not solely responsible for the results achieved in that the result depended on the same level of expertise, professionalism and cooperation of counsel for the merger partner, the United States, the unsecured creditors and the option holders; and (3) the unique facts of the case, wherein an interested purchaser existed and in which the United States, creditors and shareholders were motivated to settle, all existed at the outset of the case.

In fact, I find that the combined efforts of the applicants contributed substantially to the following results:

1) Negotiation of increased merger consideration beyond terms of pre-petition contract of $277 million to $329 million, largely in the form of deferred payments.

2) Negotiated investment banker's fee reduction from $6 million to $2.4 million, achieved by recognition that applicants performed many services traditionally performed by investment bankers.

3) Settlement of HCFA claims against Debtors prospectively to December 31, 1996, in exchange for a payment of $5 million, which resulted in $175,000 additional daily income from the date of the merger to the end of the year.

4) Re-establishment of credibility of Debtors in eyes of United States agencies and their counsel in aftermath of hostility and antagonism between prior management and the government.

5) Cost of post-petition managers reduced to one-third of amounts previously paid to Jack and Margie Mills, coupled with balanced cost reductions to meet $9 million annual cash deficit, without eviscerating value of company to merger partner.

6) Structuring of settlement to permit deferred payments by IHS which United States would credit in current dollars against its net negotiated claims of $240 million, in exchange for $10 million in additional payments in lieu of $30 million in interest that would actually accrue.

All these results were achieved in an atmosphere where United States could have attempted to exclude Debtors from the Medicare program at any time, or appealed this Court's Order finding jurisdiction to enjoin future PIP payments, either of which action

might have doomed the company. In summary, it is not an overstatement to term the results of these applicants' efforts "excellent."

I also find that the results in this case were achieved as a result of high-quality work and exemplary cooperation, not only of the applicants, but also all other professionals including those representing IHS, the United States, the unsecured creditors and the non-insider option holders. Further, all parties were aided in this process because the Mills had identified a motivated merger partner, and negotiated a potential merger, pre-petition, though the specific terms of a feasible merger were not in hand.

Each applicant has been compensated pursuant to this court's prior orders at exactly the hourly rates it agreed to work on Debtors' behalf. Because of the terms of the merger, and the release and indemnity provisions in it, any fee enhancement will be the obligation not of Debtors or Debtors' shareholders, but of the merger partner IHS, which retained its own independent counsel throughout, and which objects to any enhanced award.

The case presented a unique mixture of bankruptcy and non-bankruptcy issues and resulted in 100 percent payout of all creditor claims on an extremely expedited basis, especially given the size and reach of the business and the tainted history of the company and its prior management.

### Legal Framework of an Award

Under 11 U.S.C. Section 330(a) it is the Court's duty to set professional compensation for actual, necessary services rendered by these applicants. The Code provides that:

In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3). In this circuit the process begins with the determination of a lodestar award, utilizing the number of hours actually necessary for the task multiplied by the "prevailing" hourly rate. *See Norman v. The Housing Authority of the City of Montgomery,* 836 F.2d 1292 (11th Cir.1988); *Grant v. George Schumann Tire & Battery Co.,* 908 F.2d 874 (11th Cir.1990); *In re Port Royal Land & Timber Co.v. Berkowitz, Lefkovits, Isom & Kushner,* 924 F.2d 208 (11th Cir.1991). *Norman* relied on a series of Supreme Court decisions in concluding that attorneys' fee awards should be based on a lodestar analysis consisting of the determination of a reasonable hourly rate multiplied by hours reasonably expended. *See Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air (Delaware Valley I),* 478 U.S. 546, 564–66, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986). The lodestar "presumptively includes all of the twelve factors ... adopted in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), .... except on rare occasions the factor of results obtained and, perhaps, enhancement for contingency." *Norman* at 1299; *Schumann* at 879.

The lodestar approach avoids the subjectivity inherent in the Johnson analysis and produces a more objective and uniform result. *See Hensley* at 433, 103 S.Ct. at 1939; *Delaware Valley I* at 560–62, 106 S.Ct. at 3096; *Norman* at 1299. Congress' intent expressed in 11 U.S.C. Section 330 is that compensation in bankruptcy cases should be no less and no more than for comparable

non-bankruptcy work. *See Schumann* at 879.

> A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation....
>
> In evaluating comparability of market rates .... the district court may consider ... the *Johnson* factors....

*Norman* 836 F.2d at 1299.

In establishing the number of hours reasonably expended, the Court is required to exclude "excessive, redundant or otherwise unnecessary hours." *Norman* at 1301. Once the lodestar is determined, the Court must consider adjustments. If the results are "excellent" the court should compensate the full lodestar. If the results are "exceptional" then some enhancement is authorized. *Id.* at 1302. But enhancement is permissible only if

> ... there is specific evidence in the record to show that the quality of representation was superior to that which one would reasonably expect in light of the rates claimed.

*Id.* at 1302, *citing Blum,* 465 U.S. at 899, 104 S.Ct. at 1549; *Schumann,* 908 F.2d at 880.

Enhancement was also authorized under *Norman* if the fee is contingent, to compensate for risk of non-recovery or to compensate for delay in payment. Id. at 1302. Subsequent to *Norman,* however, the Supreme Court has held that enhancement for contingency [of outcome] is not permitted under fee-shifting statutes which provide for payment of a reasonable fee to a prevailing party.[5]

Clearly, enhancement is "rarely available" and compensation based on the lodestar calculation is "presumptively" a reasonable fee. *See Delaware Valley I,* 478 U.S. at 565, 106 S.Ct. at 3098; *In re Manoa Finance Co. Inc.,* 853 F.2d 687, 691 (9th Cir.1988) (holding that

upward adjustments of the lodestar are permissible only in certain "rare" and "exceptional" cases supported by "specific evidence" and detailed findings). The applicant bears the burden of proving its fee entitlement and while fee awards are discretionary, the trial court must articulate the reasons for the award so as to permit meaningful review. *Norman,* 836 F.2d at 1303–04.

Previous fee awards to the applicants, as already noted, were made at their full usual and customary rate and the thousands of hours of time for which compensation was sought was not materially challenged or reduced.

## CONCLUSIONS OF LAW

### I. *Fee Enhancement Criteria*

■ Enhancement rulings in bankruptcy cases are relatively few and reflect the admonition that enhancement is a rarity. Controlling precedent makes it clear that the lodestar rate allowed to professionals is presumptively considered to be a reasonable fee, and that there is a strong presumption against enhancement of fees once the lodestar rate is awarded. *See Blum* 465 U.S. at 886, 104 S.Ct. at 1542–43; *Delaware Valley I,* 478 U.S. at 565, 106 S.Ct. at 3098.

> [W]hen an attorney first accepts a case and agrees to represent the client he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests. Calculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the reasonable hourly rate, thus adequately compensates the attorney, and leaves very little room for enhancing the award based on his postengagement performance.

---

5. A caveat here. It has been recognized that bankruptcy cases do not fit perfectly in the fee-shifting case mold. *See In re Manoa Finance Co., Inc.,* 853 F.2d 687, 691 (9th Cir.1988). It remains open whether a contingency enhancement in bankruptcy cases may be awarded where the risk of non-payment is due to prospective lack of funds in the estate [contrasted with risk of outcome in the *Burlington* sense], but since there was no contractual agreement for enhanced compensation based on risk of non-payment, and the estate was solvent from the beginning, I need not decide that issue here.

*Id.* at 565–66, 106 S.Ct. at 3098; *accord In re Manoa Finance Co. Inc.,* 853 F.2d at 687. The prevailing view is that the novelty of the case and difficulty in successfully prosecuting it are reflected in the regular hourly rate charged by competent counsel. *See Shipes v. Trinity Industries,* 987 F.2d 311 (5th Cir. 1993); *accord Hendrickson v. Branstad,* 934 F.2d 158 (8th Cir.1991).

> The lodestar award (the product of reasonable hours multiplied by a reasonable rate) is presumptively a reasonable fee, and most factors relevant to determining the amount of a fee are subsumed within the lodestar. For instance, there is a "strong presumption" that "the 'results obtained' from the litigation" are reflected in the time and rate calculations of the lodestar figure ... There is a similar presumption that the contingent nature of payment is reflected in the lodestar ... Thus, to avoid double counting, the results obtained and the contingency of payment should not ordinarily be considered as independent grounds to enhance the lodestar. Although an enhancement is permissible based on these factors, enhancement is reserved for "rare" and "exceptional" cases, and must be supported by specific evidence in the record and detailed findings by the lower court ... The applicant bears the burden of demonstrating that the lodestar amount must be enhanced to constitute a reasonable fee.

*Id.* at 162 (citations omitted).

In light of the heavy burden which is placed on applicants seeking enhancement, it is not surprising to find that there are numerically more cases denying enhancement than allowing it. *See,* e.g., *In re Fender,* 12 F.3d 480 (5th Cir.1994) (allowance of enhancement was remanded by the Fifth Circuit because the bankruptcy court had failed to explain any justification for enhancement utilizing non-*Johnson* factors, i.e., factors which are subsumed into the establishment of the lodestar hourly rate); *Matter of UNR Industries, Inc.,* 986 F.2d 207 (7th Cir.1993) ("extraordinarily high quality" of service was still accounted for in the highly adequate

hourly rates charged by the firm. No evidence was offered that transactional lawyers are routinely paid bonuses or enhanced fees for their work); *In re Apex Oil Company,* 960 F.2d 728 (8th Cir.1992) (fifteen percent enhancement allowed by the bankruptcy court was reversed by the district court, but remanded by the Eighth Circuit because the district court had applied an erroneous legal standard. On remand the Eighth Circuit directed the bankruptcy court to determine whether the exceptional quality and results of the case exceeded what would ordinarily be expected of other counsel commanding the same fee as a prerequisite to allowing an enhanced fee); *see also In re Manoa Finance Co., Inc.,* 853 F.2d at 687 (remanding to the bankruptcy court for a determination whether there is "specific evidence showing why the results obtained were not reflected in either his standard hourly rate or the number of hours allowed"); *Schumann* 908 F.2d at 880 (holding that even "exceptional" results do not warrant enhancement without specific evidence that quality of representation was superior to what would be expected in light of the rates paid); *In re Music Merchants, Inc.,* 208 B.R. 944 (9th Cir.BAP 1997) (holding that enhancement of attorney's fee is not required simply by the fact that there has been a delay in receipt of payment although it is a permissible factor to consider).[6]

Nevertheless enhancements have been allowed in opinions which fully articulate the rare and exceptional bases of the award. *See In re Farah,* 141 B.R. 920 (Bankr.W.D.Tx. 1992). In that case, the court found that enhancement was authorized because of rare and exceptional results. At the outset it appeared that secured creditors would not be fully paid the outstanding balance of their claims, unsecured creditors would receive less than five percent, the debtors would be limited to exempt property of approximately $110,000, and attorneys would likely receive nothing for their efforts. In the end all secured and unsecured creditors were paid in full, $3.5 million was returned to the debtors, the fee request was only $119,000 and the

---

**6.** There is no evidence that delay merits enhancement in light of the fact that the case was concluded rapidly and that interim compensation previously had been allowed.

debtors consented to the enhancement. The court found that "results must exceed the reasonable expectations of parties under the Code" even though "successful reorganization is precisely the result contemplated by Congress in enacting Chapter 11."

In another instance, a bankruptcy court allowed enhancement while recognizing that under *Delaware Valley I* "overall performance ordinarily should not be used to adjust the lodestar rate." *In re Public Service Company of New Hampshire*, 160 B.R. 404, 415 (Bankr.D.N.H.1993); *citing Delaware Valley I*, 478 U.S. at 566, 106 S.Ct. at 3098–99. The court opined, however, that the term "rare and exceptional" as a tool for determining when an enhancement should be allowed is "void of any analytical utility." *PSC*, 160 B.R. at 418. Rather, the court held that enhancement would be allowed if the facts revealed one of two factors. First, "exceptional activity without which the estate would not achieve the results [obtainable] by other specialists of like background and level of compensation. Second, exceptional activity beyond that which was reasonably contemplated at the time of retention of counsel." *Id.* at 420. Based on this articulated test, the court awarded enhancement to some professionals and denied it to others. With respect to those who received enhancement, the financial adviser's fee of $2 million was increased to $3 million because the adviser had structured recovery of an additional $55 million to equity holders without any cost to the acquiring party, and because the financial adviser had been forced, through the inaction and lack of support of the debtor and its counsel, to step into a vacuum created by debtor in order to push the case to a successful conclusion. The court also awarded a $200,000 enhancement on a fee of $268,000 to an examiner, who had never been expressly limited to an hourly rate in his initial application for employment. The examiner, because of his unique expertise had insisted that the enterprise value of the utility, which the State of New Hampshire was contending was limited to $1.9 billion, was in fact $2.2 billion. Because of the persistence of the examiner, the state ultimately acceded to his position.

Likewise, in *In re Hillsborough Holdings Corp.*, 191 B.R. 937 (Bankr.M.D.Fla.1995), enhancement of between five and ten percent of counsel's fees were allowed to various professionals because the court found that "obstacles to counsel were unique and for the most part unforeseen at the time of their retention." *Accord In re Atlas*, 202 B.R. 1019 (Bankr.S.D.Fla.1996); *In re Morris Plan Company of Iowa*, 100 B.R. 451 (Bankr. N.D.Iowa 1989). In *Morris Plan*, base fees were approximately $450,000 and a ten percent enhancement was allowed to uniquely qualified bankruptcy counsel in a $150 million case which ended up paying one hundred cents on the dollar. At the outset, it had appeared as if it would be a low percentage case and counsel was able to obtain quick administrative review of an FSLIC denial of insurance coverage to the reorganized debtor which services were not fully compensated for in the applicant's hourly rate.

## II. *Application to this Case*

■ In seeking a common thread in successful enhancement requests, it is clear that whether the terminology is "rare and exceptional" or the more detailed and useful standard enunciated in the *PSC* case, 160 B.R. at 404, each case which has allowed enhancement has presented at lease one of the following factors:

1) Unique and unforeseen obstacles placed in counsels' path which were not foreseen at the time they were retained as in *Hillsborough*, or the unforeseeable role thrust on the financial adviser in PSC; or

2) Results which far exceeded reasonable expectations at the outset of the case as in *Morris Plan* or the windfall-like results in *Farah*, which occurred due to substantial upward movement in the stock of the company which funded the plan at a level far in excess of any expectations;

Consent by the party paying the fee, either at the time of the application as in *Farah* or evidenced by a contractual agreement for enhancement as in the *Healthmaster* case in this district.[7]

---

**7.** *See o.g., Healthmaster*, Ch. 11 Case No. 95– 20548, slip op. (Bankr.S.D.Ga., July 25, 1996)

*See also In re ICH Corp.*, Ch. 11 Case No. 395–36351, slip op. (Bankr.N.D. Tex., June 9, 1997) (McGuire, J.) (holding that allowance of $275,000.00 of $500,000.00 enhancement request was permissible because it was "not opposed by any party in interest," and the case distributed $11 million to shareholders after anticipated zero recovery at outset).

I am mindful of the fact that congratulations on a job well done are not as tangible as a monetary fee award. Nevertheless, it is true that the professionals in this case should be congratulated, because they individually and collectively presented themselves and conducted themselves throughout these proceedings in such a way as to be rightly considered among the best attorneys and managers in the United States. This is among the largest, most far-flung, and complex businesses ever to seek reorganization in the Southern District of Georgia. Because of the criminal activity which preceded the filing of this case on the part of the debtor-parent and some of its principals, because of competing public interest concerns between recovery of Medicare overpayments and criminal fines and penalties on the one hand, and continuation of essential health care to thousands of patients on the other, and other factors, it was anything but a straightforward Chapter 11 case. The case was prosecuted from filing to confirmation with nearly unprecedented speed, particularly for a Chapter 11 case of this size and complexity.

Nevertheless, all of the essential elements for such an outcome were visible at the time the case was filed. From the earliest appearances of parties before the Court and consistent with the evidence introduced at the most recent hearing, the fact that the debtor-parent and the Mills had been convicted of Medicare fraud was known. The fact that a highly interested, financially capable merger partner wished to buy the business was known. The fact that substantial overpayment liabilities were due the United States was known. The fact that the Mills, despite their conviction, would fight any reorganization plan which did not return sufficient monies to them to satisfy their many personal financial obligations was foreseeable. The fact that non-insider option holders had substantial claims under the outstanding options was known. The fact that Medicare PIPs had been suspended and that the company could not survive unless they were reinstated was known.[8] The likelihood that the case would be rapidly concluded, if not known, was certainly anticipated as a realistic probability, because it was in the mutual interest of all parties to the case for it to be rapidly concluded. The fact that one hundred percent of all claims would be satisfied in the case with a substantial return to equity, while not without many contingencies and uncertainties, was certainly anticipated because of the existence of the pre-petition merger agreement between the Debtor and IHS.

### III. *Conclusion*

Upon consideration of controlling authority, applied to the particular facts in this case, and the argument of counsel, I conclude that the application for enhancement must be denied. None of the three factors which I have identified as permitting enhancement exists in this case.

First, in light of what was known at the outset of the case I cannot conclude as Judge Paskay in *Hillsborough* that the obstacles the professionals faced were unique and unforeseen at the time they were retained.

(Dalis, J.), Doc. Nos. 327 and 328. "Based upon the findings of fact and conclusions of law set forth on the record at the close of the hearing the objection of the United States Trustee is overruled and the application for compensation by the attorneys for the debtor is ORDERED approved in accordance with the stipulation entered between the Chapter 11 trustee, the attorneys for the debtor and the equity security holder a copy of which is attached to this order and by reference incorporated heroin." In the stipulation, the Equity Security Holder agreed that it would not object to fees of the Chapter 11 Trustee and debtor's co-counsel "between $1 million and $2 million each." ¶ 3. Further that the professionals, upon satisfaction of specified conditions "will receive additional fees [beyond the interim allowance] based on the formula attached hereto." ¶ 4(b).

8. In fact, within forty-eight hours of filing, a temporary injunction had been issued which preserved the PIPs. *See Matter of First American Health Care of Georgia, Inc.,* 208 B.R. 985 (Bankr.S.D.Ga.1996).

Thus, I conclude that the hourly rates the applicants quoted for representation of the Debtor in their various capacities were not improvident in light of unforeseen circumstances, and any enhancement on that theory would be inappropriate. Stated another way, in the words of *PSC*, I do not find that there was any "exceptional activity beyond that reasonably contemplated at the time of the original retention."

Second, I find no "exceptional activity without which the estate would not have achieved the results [obtainable] by other specialists of like background and level of compensation." The Debtors sought to hire the best, most reputable, most gifted professionals available. To obtain their services, a price in the form of higher hourly rates than the lodestar rate ordinarily allowed in this District, was exacted. The excellent results obtained by the professionals reveal that the decision to hire the best was a good decision. Yet the result does not exceed what would be expected had the Debtors hired other professionals at similar rates. In the words of *Norman*, I am unable, on the facts before me, to hold that the "quality of representation was superior to that which one would reasonably expect in light of the rates claimed." *Norman* 836 F.2d at 1302; *Schumann* 908 F.2d at 880.

■ Third, there is no consent to the enhancement by the party responsible for the fee. In light of the fact that there was nothing completely unforeseen or unforeseeable about the case unknown to counsel at the time their hourly rates were quoted to the Debtor, nor such an unexpected and inordinately favorable outcome in the case, I conclude that it would be inappropriate, over the objection of the party which would now be forced to bear the financial burden of an enhancement, to award any enhancement. I recognize that counsel in seeking enhancement are not strictly limited to the fee arrangement they made at the outset of the case. *See Blanchard v. Bergeron*, 489 U.S. 87, 93, 109 S.Ct. 939, 944, 103 L.Ed.2d 67 (1989). Nevertheless, in addition to the limitations which applicable precedent makes and the burden which fee applicants must carry, I conclude that the fact that counsel have been paid throughout this case at the full hourly rate which they sought at the outset is a permissible fact to be considered. *See Blanchard* at 93, 109 S.Ct. at 944.

■ An examination of the applications for employment reveals that none of the applicants expressly contracted for the right to seek an enhanced fee. The language of each application differs, but the essence of each is that counsel will seek to be paid their standard hourly rates. To be sure, each applicant recognized that any award is subject to approval by the Court, and it is not unheard of that professional compensation requests may be reduced. It is only fair, therefore, to recognize that an upward adjustment is not *per se* prohibited. However, in the absence of a contractual agreement for enhancement, and in light of the governing authorities, it is only in the rarest of cases that enhancement will withstand scrutiny. Under my reading of these authorities this is not among those rare and exceptional cases. For the foregoing reasons, the Application for Enhancement of Compensation of Professionals and Independent Manager is denied.

It is unfortunate indeed that a case so successful in outcome, of such significance in its scope, and so unique on its facts should now be reduced, at least for these professionals, to a quite disappointing conclusion. Therefore, in denying the application I deem it essential, again, to emphasize that the professionals in this case performed in a way that, if emulated by attorneys everywhere, would quiet the crescendo of criticism regularly heaped upon the bar, and upon the legal system in general. The caliber of their work, their integrity, their mutual courtesy, their dedication to the task, in short their professionalism, was in the highest and most honored tradition of the legal profession, and the outcome of this case should in a very real sense be viewed as a monument to their efforts.

EXHIBIT "A"

| | | |
|---|---|---|
| FIRST AMERICAN HOME CARE OF ALABAMA. INC., | : | CASE NO.96–20189 |
| FIRST AMERICAN HOME CARE OF ARKANSAS, INC., | : | CASE NO.96–20190 |
| FIRST AMERICAN HOME CARE OF CALIFORNIA. INC., | : | CASE NO.96–20191 |
| FIRST AMERICAN HOME CARE OF COLORADO, INC., | : | CASE NO.96–20192 |
| FIRST AMERICAN HOME CARE OF FLORIDA, INC., | : | CASE NO.96–20194 |
| FIRST AMERICAN HOME CARE OF GEORGIA. INC., | : | CASE NO.96–20193 |
| FIRST AMERICAN HOME CARE OF ILLINOIS. INC,. | : | CASE NO.96–20195 |
| FIRST AMERICAN HOME CARE OF INDIANA, INC., | : | CASE NO.96–20196 |
| FIRST AMERICAN HOME CARE OF LOUISIANA, INC., | : | CASE NO.96–20197 |
| FIRST AMERICAN HOME CARE OF MICHIGAN, INC., | : | CASE NO.96–20198 |
| FIRST AMERICAN HOME CARE OF MISSOURI, INC., | : | CASE NO.96–20200 |
| FIRST AMERICAN HOME CARE OF NEW MEXICO, INC., | : | CASE NO.96–20199 |
| FIRST AMERICAN HOME CARE OF NORTH CAROLINA, INC., | : | CASE NO.96–20201 |
| FIRST AMERICAN HOME CARE OF OHIO, INC., | : | CASE NO.96–20202 |
| FIRST AMERICAN HOME CARE OF OKLAHOMA, INC., | : | CASE NO.96–20203 |
| FIRST AMERICAN HOME CARE OF PENNSYLVANIA, INC., | : | CASE NO.96–20204 |
| FIRST AMERICAN HOME CARE OF TENNESSEE, INC., | : | CASE NO.96–20206 |
| FIRST AMERICAN HOME CARE OF TEXAS, INC., | : | CASE NO.96–20205 |
| FIRST AMERICAN HOME CARE OF VIRGINIA, INC., | : | CASE NO.96–20212 |
| FIRST AMERICAN HOME CARE OF WEST VIRGINIA, INC., | : | CASE NO. 96–20211 |
| FIRST AMERICAN HOME CARE OF VALDOSTA, INC., | : | CASE NO.96–20210 |
| FIRST AMERICAN HOME CARE OF FT. LAUDERDALE, INC., d/b/a FIRST AMERICAN HOME CARE OF HOLLYWOOD, | : | CASE NO.96–20209 |
| FIRST AMERICAN HOME CARE OF NAPLES, INC., | : | CASE NO.96–20208 |
| ABC HOME NURSING, INC., | : | CASE NO.96–20207 |
| ABC HOME HEALTH AND HOSPICE OF BRUNSWICK, INC., | : | CASE NO.96–20215 |
| ABC HOME HEALTH & HOSPICE OF ALBANY, INC., | : | CASE NO.96–20213 |
| ABC HOME HEALTH. & HOSPICE OF MACON, INC., | : | CASE NO.96–20214 |
| OCONEE AREA HOME HEALTH & HOSPICE SERVICES, INC., | : | CASE NO. 96–20216 |
| ABC HOME HEALTH & HOSPICE OF DUBLIN, INC., | : | CASE NO.96–20217 |
| ABC HOME HEALTH & HOSPICE OF SAVANNAH, INC., | : | CASE NO.96–20218 |